**Tyree Beysean MILLER, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 07–CF–1169.**

District of Columbia Court of Appeals.

Argued March 9, 2010.
Decided March 3, 2011.

**31.** *Ellis v. United States,* 941 A.2d 1042, 1049 (D.C.2008).

Corinne Beckwith, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Channing D. Phillips, Acting United States Attorney at the time the brief was filed, and Roy W. McLeese, III, John P. Mannarino, and Samuel R. Ramer, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and FISHER, Associate Judges, and SCHWELB, Senior Judge.

SCHWELB, Senior Judge:

Tyree B. Miller was convicted by a jury of assault with intent to commit murder while armed and of eight related offenses. Miller was seventeen years old when he allegedly committed the crimes. The case arises from the shooting and wounding of Robert Jenkins, then aged eighteen or nineteen, on March 1, 2006.

On appeal, Miller's principal contention is that for a period of approximately one year before his trial, and notwithstanding repeated requests by his attorneys, the prosecution failed to disclose to the defense, until the evening before opening statements, critical exculpatory information, namely, that according to the grand jury testimony of Timothy Taylor, the prosecution's principal eyewitness, the gunman shot Jenkins while holding the pistol in his left hand. Specifically, Miller claims that if that information had been provided in timely fashion, it would have enabled his attorneys to focus their preparation and presentation of his defense on persuasive evidence showing that Miller, who is right-handed, could not have been the shooter. Miller further contends that Ryan Lindsey, a prosecution witness who was a passenger in the pick-up truck that was used in connection with the crime, who was also a potential suspect in the shooting, and who provided contradictory versions under oath as to what occurred, is left-handed. According to Miller, the government's belated disclosure of the gunman's apparent left-handedness came too late for defense counsel to recognize the significance of a video showing Lindsey signing a document with his left hand, and to use that evidence effectively. Miller claims that these failures by the prosecution to make timely disclosure were in contravention of the government's responsibilities under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, and deprived Miller of his right to a fair trial.

The trial judge held, *inter alia,* that late disclosures "are far better than no disclosures" and that in this case, the exculpatory material was provided to the defense in ample time to permit counsel to use the material effectively. In connection with Miller's claim regarding the video, the judge concluded that Miller's attorneys had sufficient time to grasp the significance of this evidence, that "[h]ere, the fault is completely with the defense," and that "[y]ou can't blame the government for this one." *Id.* Urging this court to affirm

Miller's conviction, the government asserts, *inter alia*, that disclosure was not required at all under *Brady*, and that even if disclosure was required, our precedents compel us to hold that the evidence was made available to the defense in a timely manner, that Miller has failed to show suppression of *Brady* material or legally cognizable prejudice, and that the trial judge therefore did not err or abuse his discretion in ruling as he did.

We disagree with the legal conclusions which the judge drew from essentially undisputed facts, and we hold that the government effectively suppressed material exculpatory evidence in violation of *Brady*, thereby undermining the fairness of Miller's trial. Accordingly, we reverse Miller's convictions and remand the case for a new trial.

## I.

## THE TRIAL

The proceedings against Miller began inauspiciously for the prosecution,[1] but they ended in disaster for the defense when Miller was found guilty of all charges. Miller was sentenced to serve concurrent terms of imprisonment totaling 150 months, to be followed by five years of supervised release.

### A. *The Shooting and the Apprehension of Brandon and Lindsey*

The prosecution's case began with the testimony of two eyewitnesses to the shooting, Timothy Taylor and Lynn Rollerson, who were respectively nineteen and eighteen years of age at the time of the offense. Rollerson resided in the building on Bass Place, S.E., in which the shooting occurred. Taylor had previously lived nearby.

On March 1, 2006, at about 4:30 p.m., Taylor and Rollerson were socializing with friends and tossing a football around near Rollerson's home when a black pick-up truck passed by. There were three young black men inside the vehicle, and a silver tool box was attached to it. Shortly thereafter, the driver made a U-turn and headed towards a school at the end of the street.

Taylor testified that he then saw a man wearing a face mask and a black "hoodie" come through a row of parked cars and walk past Taylor towards Jenkins, who was standing on the porch. The man asked Jenkins "why you keep looking at me?" The masked stranger grabbed a pistol from behind his back, and he fired several shots at Jenkins, severely wounding him. The gunman's mask concealed

---

1. Miller's trial was delayed for several months because the government had unusual difficulties in securing the presence of its principal witnesses. Jenkins, the victim of the shooting, initially failed to comply with his subpoena, and when he did arrive at the courthouse, he was arrested for assaulting and threatening an officer. The government ultimately decided not to call Jenkins as a witness.

Lindsey, who had testified before the grand jury and had implicated Miller, was a reluctant witness. Indeed, he was arrested on a material witness warrant, and he was ordered to wear an ankle bracelet to secure his presence at trial. Nevertheless, Lindsey failed to appear on one scheduled trial date. When Lindsey finally did take the stand, he stated that his testimony before the grand jury impli-

cating Miller was false. Lindsey's trial testimony, if credited, provided no support for the case against Miller and thus, for all practical purposes, exonerated him.

Alvin Brandon, the driver of the vehicle in which Lindsey was a passenger and which was linked to the shooting, was taken to the lockup on the day of trial for being late to court. Subsequently, during a weekend recess in the middle of his testimony, Brandon was arrested for carrying a pistol without a license. The trial judge declined to admit evidence of Brandon's arrest. Miller contends, as an alternative ground for reversal, that this ruling was erroneous. Because we reverse Miller's conviction on *Brady* grounds, we do not reach this issue.

his face, and neither Rollerson nor Taylor was able to identify Miller as the shooter.[2]

On direct examination, Taylor testified that the assailant shot Jenkins with his right hand. On cross-examination, however, Taylor admitted that approximately a year earlier, in July 2006, he had twice told the grand jury, under oath, that the gunman had used his left hand.[3] Taylor also acknowledged that recently, and after the date of his grand jury testimony, he had entered a guilty plea to attempted possession of a controlled substance with the intent to distribute it. Taylor testified that he had not yet been sentenced for this offense, but he asserted that no promises had been made to him, in connection with his testimony at Miller's trial, as to what his punishment for the drug offense would be or what sentence the government would request.

After the shooter left the scene, Taylor and Rollerson observed that Jenkins was seriously injured.[4] One of the young men called 911, and they provided the police with a description of the pick-up. The officers broadcast a lookout for the vehicle, and shortly thereafter Officer Lavern Miller of the Metropolitan Police Department observed a truck matching the description being driven out of the Bennco Shopping Center, which is located several blocks from the crime scene. Officer Miller activated his lights and siren. The driver of the vehicle initially attempted to avoid apprehension by weaving in and out of traffic, but he eventually pulled over. The occupants of the pick-up turned out to be Alvin Brandon, who was driving, and Ryan Lindsey, who was Brandon's passenger.

Officer Miller detected a strong smell of gunpowder in the vehicle. Brandon was arrested for reckless driving, but Lindsey was released.

In July 2006, Brandon and Lindsey appeared before the grand jury, and both men implicated Miller in the crime. Each man also subsequently testified at Miller's trial. Because neither Taylor nor Rollerson was able to identify the man behind the mask, the government's proof of the identity of the shooter turned largely on the credibility of Brandon and Lindsey.

## B. *Brandon's Testimony*

At the trial, Brandon was the only witness who identified Miller as the guilty party. Brandon testified that in the late afternoon of March 1, 2006, he was driving his mother's black pick-up truck. At Bennco Shopping Center, Brandon encountered his friend Lindsey. Lindsey asked Brandon to give a ride up the street to Lindsey and to one of his (Lindsey's) friends, who turned out to be Miller. Brandon agreed to Lindsey's request. At trial, after some hesitation—Brandon initially "guess[ed]" that Miller was the man who needed a ride—he testified that it was "the defendant" who rode in his truck on the day in question. He stated that Miller was wearing a black hoodie and jeans.

According to Brandon, Lindsey directed him to make several turns, and the men eventually arrived at Bass Place. Either Miller or Lindsey asked Brandon to make a U-turn, and after Brandon had done so, Miller got out of the vehicle. Brandon turned around again and, at Lindsey's re-

2. Miller's hair was worn in dreadlocks at the time of the shooting. According to Taylor, the shooter had short hair, and Taylor saw no bunching of hair under the shooter's cap.

3. This critical testimony is discussed in greater detail in Part II B, *infra*. We note that the prosecutor did not ask Rollerson which hand the gunman used, and Rollerson's testimony includes no mention of the subject.

4. Jenkins was shot twice in the back and twice in his legs. He suffered life-threatening injuries to a lung and to his liver and pancreas.

quest, he waited for Miller to return to the truck. Brandon testified that he saw Miller go into an apartment complex, and he then heard a number of gunshots. Apprehending that if he stayed around, he might be linked to a shooting, Brandon tried to drive away, but the "kill switch" in his truck cut off the engine, and Lindsey had to reach down and push a button to restart the vehicle. Brandon testified that he then saw Miller, who had a pistol in his hand, running back towards the pick-up. Brandon claimed that, at this point, he did not allow Miller to get back into the vehicle "[b]ecause I didn't want to have nothing to do with him after ... what just happened." Miller ran off toward a nearby school.

Brandon testified that Lindsey then begged him to allow "my man" (meaning Miller) back into the pick-up. Concerned that Miller would be displeased if Brandon left him in the lurch, and that Miller would confront him the next time the two met, Brandon acceded to Lindsey's importuning. Once Miller was inside the truck again, Lindsey asked him what happened. Miller replied that he had tried to "light his ass up," a remark which Brandon understood to mean that Miller had tried to kill the man he had been looking for. Miller also indicated that he had concealed the weapon at the school, and he warned Brandon and Lindsey that the event "stays between us three." After a drive of no more than two minutes, Brandon dropped Miller off, and he then drove back to the Bennco Shopping Center with Lindsey still in the pick-up.

A few minutes later, concerned that the police might be looking for his truck, Brandon decided to drive away. As he and Lindsey were leaving, they were stopped by the police. The police searched the vehicle, and they smelled gunpowder but found no weapons inside. Officers who arrived on the scene had their pistols drawn and pointed at Brandon and the truck. Brandon was handcuffed and placed on the ground. Officers told him that he was a suspect in the shooting and that if the victim died, Brandon could be charged with first-degree murder. He was told that if he could identify the shooter, "that may be the only thing that keeps you from catching a charge."

When Brandon was interviewed by the police after his arrest, he recounted the basic chronology described above, but there were significant differences between his initial account and his trial testimony. In his first interview, Brandon "swore to God" that he did not know the gunman's name, and he claimed that he had never seen the man before, a statement which he later admitted to be untrue. Brandon also failed to disclose that the shooter had re-entered the truck after having fired at his victim. Brandon admitted that he lied to the police about the clothing that the suspect was wearing because he (Brandon) was "just trying to get out of jail that night." Brandon also testified that at the time of this interview, he was afraid of telling what he knew, believing (apparently based on the code of the street) that "snitching" might cost him his life. At the trial, Brandon asserted that he was still "a little bit scared" of testifying in Miller's presence. The parties stipulated that Brandon had been convicted of petit larceny in 2004.

## C. *Lindsey's Testimony*

Ryan Lindsey was called as a witness for the prosecution. He acknowledged that on the afternoon in question, he was riding with Brandon—but *not*, he claimed with Miller—in a black pickup truck. Lindsey denied that he and Brandon had driven to Bass Place, and he claimed that on that day, he had not seen Miller at all. Because Lindsey had described the

relevant events quite differently when he appeared before the grand jury a year earlier, the prosecution introduced as substantive evidence portions of Lindsey's grand jury testimony.

Lindsey's account to the grand jury of the events surrounding the shooting was largely consistent with Brandon's later trial testimony. He stated that he and Miller were friends. On the day of the shooting, Miller requested Lindsey to ask Brandon to give him (Miller) a ride up the street from the Bennco Shopping Center. Although Lindsey "kind of had an idea" of what Miller might be planning, he nevertheless asked Brandon to give him and Miller a ride, and Brandon agreed to do so. Lindsey admitted that he "kind of got caught up . . ." in Miller's suspected plans. Miller directed Brandon to the area of 5031 Bass Place. After Brandon had driven along the block once, he made a U-turn. Miller got out of the car, and shortly thereafter Lindsey heard seven or eight shots. As Brandon tried to turn the truck around, the engine stalled, and Brandon told him to push a button to restart the motor. When Lindsey could not find the button, Brandon reached over and pushed it. Miller then came running back with a skull cap on his head, a ski mask on his face, and a box-shaped pistol in his hand.

At first, not wishing to be associated with a shooting, Brandon and Lindsey told Miller that he was not to get back into the truck, and Miller ran off. As Brandon started to drive away, however, the two men saw Miller again, and this time Brandon relented and allowed Miller to re-enter the vehicle. Brandon and Lindsey then dropped off Miller near his home.

At trial, after invoking his privilege against self-incrimination and receiving immunity for his testimony before the grand jury, Lindsey testified that his evidence before that body had all been a lie. He also claimed that he did not remember having been asked any questions during his grand jury appearance. Lindsey testified that he had made up the story implicating Miller in a shooting because he was jealous of Miller and "never really like[d] him too much." Lindsey stated that following Brandon's release from custody, the two men had come up with their story based on "rumors in the neighborhood" and "people talking." Having been warned by the police that he could go to jail for up to ten years, Lindsey told the officers "what they wanted to hear so I could get out of where I was at." He "basically told them what I told them because I was scared and it was basically all a lie."

### D. The Parties Rest and the Defense Moves to Reopen

The government introduced evidence showing that Miller did not have a registered firearm or a license to carry a pistol. The defense introduced a stipulation that the date of Miller's arrest was April 24, 2006, but offered no other evidence. After both parties had rested, the judge began to charge the jury, but the court recessed for the day before the instructions had been completed.

On the following morning, Miller's attorney asked the court to reopen the record and to permit the defense to introduce, as demonstrative evidence, a portion of the videotape of Lindsey's interview with the police. The video showed that Lindsey had signed a rights card with his left hand. The prosecutor objected, and the trial judge inquired, *inter alia*, why counsel had not simply asked Lindsey which hand he had used. Defense counsel admitted an "oversight," but attributed the error to the prosecution's failure to disclose, for almost a year, Taylor's July 2006 testimony before the grand jury to the effect that the gunman had shot Jenkins with the weapon in

his left hand. The judge denied the defense motion, primarily on the ground that to permit the defense to reopen its case at this stage of the trial would unfairly highlight the new evidence and prejudice the government. Following closing argument, the jury convicted Miller of all charges. This appeal followed.

## II.

### FACTS PERTINENT TO MILLER'S *BRADY* CLAIM

#### A. *The Brady Request*

In a letter to the prosecutor dated June 6, 2006, Miller's attorney requested "prompt disclosure of all exculpatory information," including "all information known to the government ... which is favorable to the defense," as well as "all information indicating, in whole or in part, that Mr. Miller was not involved in the alleged offense." Counsel further requested the government to provide the defense with "any descriptions of the perpetrator of the alleged offense which in some material respect ... differs [sic] from Mr. Miller," and "[a]ny prior inconsistent, non-corroborative, or other witness statements which the witness' trial testimony will not reflect."

#### B. *Whether the Shooter was Left-handed*

Less than a month later, on July 5, 2006, Timothy Taylor, who as we have seen, witnessed the shooting, appeared before the grand jury. Taylor testified, in pertinent part, as follows:

> QUESTION: Okay. Now, did you see where this person got the gun from?
> ANSWER: No—oh, yes, from his back.
> QUESTION: Okay, let the record reflect that the witness is moving his left hand to his back. Do you remember now whether the shooter was using his left hand or his right hand? Do you remember?
> ANSWER: He used his left.
> QUESTION: He used his left hand?
> ANSWER: Yes.

Evidence that the gunman fired at Jenkins with his left hand was obviously favorable to a right-handed defendant.[5] Nevertheless, and notwithstanding defense counsel's specific requests, the prosecutor did not disclose the grand jury testimony or its substance in the wake of Taylor's appearance before the grand jury, nor had he provided it to the defense six months later, on the first trial date, January 16, 2007, when Miller's attorney complained at length that *Brady* evidence had not been turned over. Several status hearings and proposed trial dates during most of the

---

**5.** There was no dispute at trial that Tyree Miller is right-handed. The prosecutor requested a stipulation that the defendant is right-handed, and defense counsel responded that "[we've] always been willing to [stipulate to that fact]." Defense counsel also stated on the record that she "spoke with the government briefly about it," that the prosecutor asked whether the defense would "admit that Mr. Miller is right-handed, and [that] we said, yes, we would admit that." For reasons that are not apparent from the record, no such stipulation was introduced into evidence.

The record is unclear as to precisely when the prosecutor knew or should have known that Miller was right-handed and that Taylor's testimony before the grand jury, to the effect

that the gunman shot Jenkins with his left hand, was therefore exculpatory. As Judge Fisher acknowledges however, "the government should have disclosed this portion of Taylor's grand jury testimony (or at least its substance) sooner." See dissenting opinion, *post*, at 1130 n. 12. The prosecutor made no attempt, at trial, to justify the belated disclosure upon the ground that the government lacked knowledge that (unlike the shooter described by Taylor), Miller was right-handed. So, too, before this court, in arguing that there was no *Brady* violation, the government makes no claim that the prosecutor was unaware of Miller's right-handedness, but contends only that Miller was not prejudiced by the late disclosure.

first half of 2007 came and went, with defense counsel complaining that the government was not honoring its obligations under *Brady*. Nevertheless, throughout this period, the prosecution failed to disclose Taylor's grand jury testimony.

On June 11, 2007, counsel for Miller again asked for "any and all statements" from a witness that referred to "whatever else he saw that does not comport with [the identification of] Mr. Miller," and "[a]ny information about the physical appearance of the shooter that does not comport with Mr. Miller. The prosecutor responded: "Well then we're in compliance then. *She has it.*" (emphasis added). Nevertheless, it was not until the night before opening statements, more than two weeks after the prosecutor represented that "she [defense counsel] has it," that the government included in its *Jencks* Act[6] packet Taylor's grand jury testimony, in which the witness had sworn, almost a year earlier, that the gunman had fired with his left hand.

On June 25, 2007, the trial judge considered, among other issues, a motion by the government for an order precluding the defense from presenting any evidence or argument to the effect that a third person committed the shooting. *See Winfield v. United States*, 676 A.2d 1 (D.C.1996) (en banc). In support of this motion, the prosecutor represented that "clearly I don't think there's any evidence that the defense can introduce to show that anyone else but Tyree Miller committed this crime." At the time that this representation was made, the government still had not provided Miller's attorneys with any information suggesting that the gunman was holding

the pistol in his left hand when he shot and wounded Jenkins.

The jury was selected on June 27, 2007, and at 9:30 p.m. on that evening, with opening statements scheduled for the following morning, the prosecutor delivered to Miller's attorneys "four inches of documents," which included Taylor's testimony before the grand jury. On the following day, June 28, 2007, after opening statements, Taylor took the stand and testified, contrary to his grand jury testimony, that the gunman used his right hand when he shot Jenkins. Although the defense had not received the transcript of Taylor's July 2006 appearance before the grand jury until the previous evening, Miller's attorney impeached Taylor with his testimony before that body to the effect that the shooter had used his left hand. Taylor acknowledged that his recollection of the shooting when he appeared before the grand jury was better than his memory at the time of trial, but he nevertheless asserted on redirect examination,[7] somewhat inconsistently, that his trial testimony in June 2007 as to which hand the gunman had used was more accurate than his grand jury testimony in July 2006. According to Taylor, this was so because the incident "happened so fast" and because it later "came to [him]" that the shooter had actually used his right hand, even though he (Taylor) had previously stated and then repeated the contrary. As previously noted, at the time he testified at trial, Taylor was awaiting sentencing for attempted PWID, and his trial testimony was obviously more favorable to the prosecution than adherence to his account before the grand jury would have been.

---

6. 18 U.S.C. § 3500; *see also Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

7. In his initial redirect examination of Taylor, the prosecutor failed to ask him any questions regarding which hand the assailant had used

to shoot Jenkins. On the following morning, apparently recognizing his omission, the prosecutor requested leave, before the next witness was called, to recall Taylor. The judge agreed, and it was then that Taylor provided his explanation of the discrepancy.

Following Taylor's testimony, the defense again asked the court to rule that the government had violated its *Brady* obligations. Counsel challenged, in particular, the late disclosure of Taylor's sworn evidence before the grand jury that the gunman had short hair (while Miller wore his hair in dreadlocks) and that he (the shooter) used his left hand to fire at Jenkins. Counsel argued that the late disclosure prejudiced Miller because "[w]e received it at 9:30 last night, your Honor"— "[w]e didn't have time to work it into an opening" or "to develop it in cross-examination," and "it's hard to know how to change a defense strategy at 9:30 p.m. the day before opening [statements]." The prosecutor responded that Miller was right-handed, but he argued that "it's a stretch" to say that because "the shooter had the gun in his left hand ... the shooter is thus left-handed." In the prosecutor's view, "[t]here is no indication that [the shooter was] left-handed"—"[t]here's grand jury testimony that the gun was in the left hand, but that doesn't mean that the shooter was left-handed." [8]

The judge disagreed with the prosecutor, observing that it "would [come across] to a reasonable listener that somebody who's holding a gun in his left hand is left-handed." Nevertheless, the judge concluded that Miller's attorney had been "very effective" in cross-examining Taylor "regarding left-handed versus right-handed." The judge also stated that Miller's attorneys or their investigators "could have conducted interviews" after the evidence was disclosed. The judge said that he was "shocked" that defense counsel did not have "sufficient time to work it into an

opening," and he stated that if he (the judge) had been requested to do so, he would have considered granting the defense a continuance to enable counsel to prepare further prior to Taylor's testimony. The judge told Miller's attorneys, however, that he "saw no evidence whatsoever that you were unable to use it effectively in the examination of Mr. Taylor." The judge stated that he was "not pleased with late disclosures, but [that] they are far better than no disclosures," and he reiterated that "disclosures prior to opening are better than no disclosures." In conclusion, the judge ruled that Miller had not been prejudiced and that no special instruction or other remedy was warranted.[9]

### C. Whether Lindsey was Left-handed

On July 3, 2007, when Ryan Lindsey was called to the stand as a prosecution witness, Miller's attorney attempted to establish, during cross-examination, that Lindsey was left-handed. At one point, counsel requested that the record show that Lindsey had used his left hand to point to an exhibit. The judge responded "Okay." *Id.* The prosecutor, however, objected to this characterization, and a short time later he asked that the record reflect that Lindsey had subsequently used his right hand to point out a location on a map. The trial judge so ordered. The judge then stated that his "recollection [was] now refreshed," and that on the second occasion, "I think [Lindsey] just pointed with his right hand." The judge told the jurors that he did not focus on which hand Lindsey had used on the first occasion, that the jurors should rely on their own recollection, and that he would "leave

---

8. This position has not been pressed by the government on appeal.

9. The defense had proposed an instruction to the effect that the government had failed to

disclose significant exculpatory evidence in a timely manner, and that the jury could properly consider this failure as tending to show the prosecutor's consciousness that his case against Miller was a weak one.

it to [them] to determine which hand Lindsey had used."

The judge began instructing the jury in the late afternoon of July 5, 2007. On the following morning, before the judge resumed his final instructions, and before the parties presented closing arguments, Miller's attorney asked the court to permit the defense to reopen its case and to play for the jury a portion of a videotape of Lindsey's statement to police. The video would show, defense counsel explained, that Lindsey signed the waiver-of-rights card with his left hand. Counsel acknowledged that this was "a portion of the tape that we've never focused on because it was all preliminary to his interview," and that the defense had not realized until the previous night—just hours after Lindsey completed his trial testimony—that the videotaped statement contained demonstrative evidence tending to show that Lindsey was left-handed

The judge was not at all receptive to the defense request. He stated that he could not see, "several days after [counsel] made good use of left-handed versus right-handedness at trial in cross-examining Timothy Taylor," how "you could not have thought about that issue." In the judge's view,

it could have been an oversight, it could have been something deliberate, but *it was not something caused by the government. It was caused by counsel,*

*and counsel was well aware of that. You can't blame the government for this one.*

(Emphasis added.) Miller's attorney acknowledged "a terrible oversight on the part of counsel"—an exaggerated *mea culpa*, in our view, given all of the circumstances—but argued that "Mr. Miller has this fundamental right to call witnesses, to present a defense, and we haven't presented this issue."

The judge suggested that a stipulation that Lindsey was left-handed was "the fairest way to go," [10] but the prosecutor refused to agree to such a stipulation. The judge denied the defense request to reopen its case primarily on the ground that "[t]he video was always available," it was "available to the defense since well before trial," and "the defense had everything and failed to ask a question." [11] Indeed, according to the judge: "[H]ere the fault is completely with the defense."

In closing argument, Miller's attorney, unable to use the evidence in the video, did the best that he could with Taylor's grand jury testimony that the shooter used his left hand. Counsel emphasized that Taylor had "[n]o doubt about it" and that Taylor had "stood by this story for a long, long time." Counsel also pointed out that Taylor, who was awaiting sentence, had a powerful incentive to provide trial testimony favorable to the prosecution. [12] Fur-

10. In the judge's view, reopening the case would have unfairly highlighted the evidence, especially if the prosecutor would be unable to recall Lindsey to explain whether it was his practice to sign documents with his left hand but to use his right hand for other purposes. Lindsey had been released from his material witness status after counsel for both sides had represented that they would not be eliciting further testimony from him.

11. Earlier in the trial, the judge had indicated, after permitting the prosecutor to recall one witness and to reopen the direct examination of another, that he would extend the

same courtesy to the defense. In the instances in which the judge provided these opportunities to the prosecution, however, the question of reopening a party's case after the judge had begun to instruct the jury simply did not arise, and we do not agree with Miller's claim that the situations were comparable.

12. Although Taylor had spoken with the prosecutor in Miller's case, there was no direct evidence that Taylor knew that it would be to the government's advantage if he testified that the gunman shot with his right hand. Perhaps Taylor's very belated recollection, long

ther, Miller's attorney argued, Taylor was unable to say when and how it was revealed to him that his grand jury testimony was wrong, or how it was that "[t]hings bec[a]me clear months and months later." Thus, the defense was able to make some significant use of Taylor's grand jury testimony, notwithstanding its delayed disclosure. Nevertheless, Miller argues, and we are constrained to agree, that Miller's claim that Taylor was right the first time, that the victim may well have been shot by the left-handed Lindsey, and that there was therefore a reasonable doubt as to the right-handed Miller's guilt, would have been substantially more persuasive if Miller had been permitted to present the videotape showing Lindsey signing with his left hand.

## III.

## ANALYSIS

■ Miller seeks reversal of his convictions on two separate, though related, grounds. First, he contends that the government's failure, until the night before the opening statements, to disclose Taylor's grand jury testimony that the man who shot Jenkins used his left hand to do so effectively deprived Miller of the opportunity to prepare and present what would have been the most effective defense available. He claims that the belatedness of the disclosure·violated *Brady*, and that the trial judge committed reversible error in holding otherwise. Second, Miller contends that the judge abused his discretion in refusing to permit the defense to reopen its case when Miller's attorneys discovered

from the videotape, shortly after the parties had rested, that Lindsey had signed a rights card with his left hand. We agree with Miller with respect to the first of these issues, and we conclude as a matter of law, based on undisputed historical facts, that although, in isolation, the judge's refusal to interrupt final jury instructions to permit introduction of the videotape arguably might not have been unreasonable,[13] it was the prosecution's delay in disclosing Taylor's grand jury testimony that contributed decisively to the defense's failure to appreciate in more timely fashion the importance of the videotape, and that therefore cast in a materially different light the question whether the judge abused his discretion in not permitting the defense to reopen its case after the parties had rested. In sum, we conclude that the government suppressed material exculpatory evidence in violation of *Brady*, and that the trial judge's rulings to the contrary constituted reversible error.

### A. *Background*

■ The Due Process Clause of the Fifth Amendment requires the prosecution to disclose to the defense, upon request, material evidence—including impeachment evidence—that is favorable to the accused. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194; *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). This duty of disclosure is based on the most fundamental notions of fairness, which bear repeating here:

after he testified that Jenkins' assailant had used his left hand, that the gunman had actually shot with his right-hand, was entirely unrelated to the potential favorable treatment that Taylor might gain by helping the prosecution. The jury would not have been obliged, however, to view the change in Taylor's account so generously or to attribute it to coincidence. "Coincidences happen, but

an alternative explanation not based on happenstance is often the one that has the ring of truth." *Poulnot v. District of Columbia*, 608 A.2d 134, 139 (D.C.1992).

13. "[T]o admit the evidence in splendid isolation would give it undue emphasis." *Furtado v. Bishop*, 604 F.2d 80, 95 (1st Cir.1979).

Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts." A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not "the result of guile," to use the words of the Court of Appeals.

*Brady,* 373 U.S. at 87–88, 83 S.Ct. 1194 (footnote and citations omitted); *see also Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (the interest of the United States in a criminal prosecution "is not that it shall win a case, but that justice will be done"). "*Brady* is not a discovery rule but a rule of fairness and minimum prosecutorial obligation." *Curry v. United States,* 658 A.2d 193, 197 (D.C.1995) (citation omitted).

 Our criminal justice system is implemented by imperfect and fallible human beings, and some errors and unjust outcomes are inevitable (although, we hope, comparatively rare). But the most dreaded and devastating example of justice gone awry is the conviction and prolonged incarceration (and in some jurisdictions the execution) of an innocent defendant, and the rule of *Brady v. Maryland* is designed to prevent such miscarriages of justice. *See, e.g., United States v. Bagley,* 473 U.S.

667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).[14] The principles of *Brady* must therefore be conscientiously applied not only by judges, but by prosecuting attorneys as well. To be sure, in the words of one commentator, "*Brady* presents a significant and unique departure from the traditional adversarial mode of litigation," for it places the prosecutor in the "schizophrenic situation" of being obliged to "balance competing and contradictory objectives," *i.e.,* the role of vigorous advocate in adversarial litigation and, at the same time, the duty to protect the defendant's right to exculpatory evidence. Bennett L. Gershman, *Litigating Brady v. Maryland: Games Prosecutors Play,* 57 CASE WESTERN L.REV. 531, 533 (hereinafter *Litigating Brady* ). Nevertheless, the constitutional command of *Brady* unambiguously prescribes the prosecutor's priorities: "[T]he prosecutor's obligation [is] to seek justice before victory." *Boss v. Pierce,* 263 F.3d 734, 742 (7th Cir.2001).

 The suppression of exculpatory evidence denies the defendant liberty without due process of law "irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. Further, and critically for purposes of this case, the Constitution requires that disclosure be made "at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case." *Edelen v. United States,* 627 A.2d 968, 970 (D.C.1993) (citation omitted); *Curry,* 658 A.2d at 197. This court "has rejected any notion that disclosure [immediately prior to the cross-examination of a prosecution witness] in accordance with the Jencks Act satisfies the prosecutor's duty of seasonable disclosure under *Brady.*" *Edelen,* 627 A.2d at

---

**14.** Presently awaiting decision by the Supreme Court is a case in which a prosecutor's violation of his obligations under *Brady* led to the unjust incarceration of an innocent man for eighteen years. *See Connick v. Thompson,* No. 09–511, argued Oct. 6, 2010.

970–71 (citing *James v. United States,* 580 A.2d 636, 643–44 (D.C.1990)). Prosecutorial resort to a strategy of "delay and conquer," though believed by some commentators not to be uncommon, *see, e.g., Litigating Brady,* 57 CASE WESTERN LAW REV. at 41–43, is not acceptable.[15]

■ An important purpose of the prosecutor's obligations under *Brady* is to "allow[ ] defense counsel an opportunity to investigate the facts of the case and, with the help of the defendant, craft an appropriate defense." *Perez v. United States,* 968 A.2d 39, 66 (D.C.2009) (citing *Edelen,* 627 A.2d at 970). The American Bar Association's Standards for Criminal Justice, The Prosecution Function, §§ 11–2.1(c) & 11–2.2(a) (2d ed. 1980), (hereinafter "ABA Standards"), specify that disclosure of exculpatory information is to be made "at the earliest feasible opportunity" and "as soon as practicable following the filing of charges."[16] This court has emphasized

that "[a] prosecutor's timely disclosure obligation with respect to *Brady* material can never be overemphasized, and the practice of delayed production must be disapproved and discouraged." *Boyd v. United States,* 908 A.2d 39, 57 (D.C.2006) (citations omitted). We expect this constitutional duty to be taken both literally and seriously; "[a] rule ... declaring [that the] prosecution may hide, defendant must seek, is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke,* 540 U.S. 668, 696, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (citation and internal quotation marks omitted). Deferral of disclosure of what might well (and in fact did) turn out to be critically important exculpatory information, until the night before opening statements as a part of a *Jencks* package, is not compatible with the Constitution, with our case law, or with applicable professional standards. As we observed in *Curry,* 658 A.2d at 198,

---

**15.** Although all members of the court agree that in this case disclosure should have been made earlier, we do not, on the record before us, attribute to prosecuting counsel any deliberate violation of their obligations under *Brady.*

**16.** While obviously not dispositive, the ABA Standards appropriately inform our analysis. As the Supreme Court recently had occasion to reiterate in the somewhat analogous context of determining what constitutes constitutionally ineffective assistance of counsel,

> [w]e long have recognized that prevailing norms of practice as reflected in American Bar Association standards and the like are guides to determining what is reasonable. *Padilla v. Kentucky,* —— U.S. ——, 130 S.Ct. 1473, 1482, 176 L.Ed.2d 284 (2010) (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (internal quotation marks omitted)). In *Cone v. Bell,* —— U.S. ——, 129 S.Ct. 1769, 1783 n. 15, 173 L.Ed.2d 701 (2009), the court discussed the ABA Standards in addressing the prosecutor's obligations under *Brady,* and thus viewed them as relevant, though not determinative. Judicial opinions routinely

cite treatises, the various Restatements of the Law, and law review articles, and we discern no reason to exclude from our consideration guidelines prepared by members of the nation's foremost legal organization who are experienced in the criminal law.

In this jurisdiction, Rule 3.8 of our Rules of Professional Conduct provides in pertinent part, under the heading of "Special Responsibilities of a Prosecutor," that counsel for the prosecution in a criminal case shall not

> (e) Intentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense.

Comment 1 to Rule 3.8 refers favorably to the ABA Standards, describing them as "the product of prolonged and careful deliberation by lawyers experienced in both criminal prosecution and defense." Comment 1 goes on to state that Rule 3.8 is not intended "either to restrict or to expand" the obligations of prosecutors derived from the Constitution or applicable federal or District of Columbia statutes or rules.

almost a year elapsed between that indictment and the disclosure of Jones' statement. Such delay may imperil a defendant's right to a fair trial, and a conscientious prosecutor will not countenance it.

 "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). If the prosecution has failed to make timely disclosure of exculpatory evidence, and if there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different, then the defendant's conviction cannot stand." *Edelen*, 627 A.2d at 971; *see also Kyles*, 514 U.S. at 434, 115 S.Ct. 1555.

### B. *Whether the Evidence was Exculpatory*

There can be no doubt—and all members of the court agree—that the government had an obligation under *Brady* to disclose Taylor's grand jury testimony, or its substance, to the defense, and that the belated disclosure, as part of the *Jencks* packet, was untimely. In its brief, the government acknowledges that Taylor's grand jury testimony that the assailant fired with his left hand was "potentially exculpatory," because

> [i]f the defense demonstrated that appellant was right-handed and that someone with the opportunity to commit the offense was left-handed, then evidence that the shooter held the gun in his left hand would support the inference that appellant was not the shooter.

In a claim that is remarkable for its breadth, the government asserts in a footnote to its brief that the prosecution "was not obligated to disclose this information at all" because *Brady* requires disclosure only of information that is both favorable to the defense and material to the outcome. According to the government, the evidence that the gunman shot Jenkins with his left-hand was not "material" even though Miller is right-handed. But as we explained in *Boyd*, the Supreme Court recognized in *Strickler*, 527 U.S. at 281, 119 S.Ct. 1936, that there is a duty of disclosure even when the items disclosed subsequently prove not to be material. *Boyd*, 908 A.2d at 60. We further stated in *Boyd* that the language in *Strickler* "can fairly be read only as recognizing that a duty of disclosure exists even if it later appears that reversal is not required." *Id.*[17]

Although, as Judge Fisher correctly points out in his dissenting opinion, *post* at 1126 & n. 9, the Manual does not create enforceable rights for criminal defendants, it does provide a telling contrast between the government's own stated sense of fair-

---

**17.** Indeed, the United States Attorneys' Manual (U.S. Dep't of Justice 2010), which contains a most constructive and objective description of a prosecutor's responsibilities pursuant to *Brady*, states, *inter alia*,

> 1. that prosecutors "generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence";
> 2. that Justice Department policy "requires disclosure by prosecutors beyond

that which is 'material' to guilt as articulated in *Kyles* ... and *Strickler* ...";
> 3. that impeachment information "must be disclosed regardless of whether it is likely to make the difference between conviction and acquittal of the defendant for a charged crime"; and
> 4. that in most cases, due process and Justice Department policy require that disclosure of exculpatory and impeachment evidence be made in advance of trial.

*Id.* § 9.5.001 B, C & D

ness vis-a-vis criminal defendants and its unqualified assertion, in this case, that it was not obliged to disclose to the defense Taylor's plainly exculpatory testimony before the grand jury.

 Moreover, as this court recently reiterated in *Zanders v. United States,* 999 A.2d 149, 163–64 (D.C.2010),

> it should by now be clear that in making a judgment about whether to disclose potentially exculpatory information, the guiding principle must be that the critical task of evaluating the usefulness and exculpatory value of the information is a matter primarily for defense counsel, who has a different perspective and interest from that of the police or prosecutor. *See Perez* [968 A.2d at 66] (noting that *Brady* disclosures are "for the purpose of allowing defense counsel an opportunity to· investigate the facts of the case and, with the help of defendant, craft an appropriate defense"). *It is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited at trial, or ultimately rejected by the fact finder.*

(Emphasis added.)

In *Leka v. Portuondo,* 257 F.3d 89 (2d Cir.2001), an opinion that is unusually instructive with respect to several of the issues presently before us, the court concluded that certain evidence withheld from the defense was exculpatory for *Brady* purposes because it was "of a kind that would· suggest to any prosecutor that the defense would want to know about it." *Id.* at 99. We entertain no doubt that testimony, given shortly after the crime was committed, to the effect that the gunman used his left hand to shoot the victim (in a case in which the defendant is right-handed) satisfies this eminently sensible standard.[18]

### C. *Whether the Evidence was Suppressed*

The trial judge made it clear during the course of Miller's trial that, in his view, the prosecution's failure to disclose, until the night before opening statements, Taylor's testimony before the grand jury that the gunman used his left hand to shoot the victim did not amount to suppression of that evidence. The judge emphasized that late disclosure is "far better" than no disclosure at all. As the· judge saw the issue, the defense could have used its attorneys and investigators to follow up on the material provided in the *Jencks* packet even though counsel were already in trial, especially since the trial began before but ended after the long July 4th weekend, so that counsel had several trial-free days. Moreover, the judge was of the opinion, especially in relation to the defense's failure to recognize the significance of, and introduce into evidence, the video showing Lindsey signing a rights card with his left hand, that "the fault lies completely with the defense" and that "[the defense] can't blame the government for this one." In other words, the judge put the onus entirely on the defense for its failure fully to adjust its strategy and to refocus and complete its investigation during a very busy trial week, and not at all on the government for deferring, until the evening before opening statements, the disclosure, together with several inches of *Jencks*-related documents, of the potentially excul-

---

**18.** As Miller's attorneys point out in their brief, one need not be a lawyer to appreciate the significance of such evidence. Indeed, as those of us who have reached a certain age are unlikely ever to forget, the fact that the accused was left-handed effectively demonstrated his innocence in two highly successful motion pictures: *"In the Heat of the Night"* (1961), and *"To Kill a Mockingbird"* (1962), the latter film being based on Harper Lee's Pulitzer Prize-winning novel.

patory testimony which Taylor had given a year earlier.

We are unable to agree with the trial judge's allocation of responsibility in this essentially undisputed factual scenario. To the extent that able and experienced counsel from the Public Defender Service were at fault at all, their failure to recognize more swiftly the significance of the signing of the rights card in the Lindsey videotape was largely the result of prosecutorial delay in complying with the government's obligations under *Brady.* As a practical matter, the adoption by this court of the trial judge's analysis could be taken to mean that so long as the prosecution provides exculpatory material to the defense on the eve of trial and in time for a skilled attorney[19] to make some use of it, then no matter how long the government has delayed disclosure, and regardless of how compressed defense counsel's opportunity to make new investigative, strategic and tactical decisions in mid-trial, based on the new evidence, may be, the prosecution has satisfied its obligations under *Brady.* The truism "better late than never," assessed from such a perspective, can too readily be expanded to embrace the notion that even "very late is good enough." We reject such a theory as inconsistent with *Brady.*

As previously noted, there is apparent consensus among those experts who formulated the applicable professional standards for the nation's most prominent legal organization that ethically, a prosecutor is obliged to disclose material exculpatory evidence "at the earliest feasible opportunity" and "as soon as practicable following the filing of charges." *See* ABA Standards, Nos. 11–2.1(c), 11–2.2(a). Factual scenarios vary, however, and constitutionally, "[i]t is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made." *Leka,* 257 F.3d at 100.[20] But as we have repeatedly recognized, exculpatory evidence must be disclosed in time for the defense to be able to use it effectively, not only in the presentation of its case, but also in its trial preparation. *Lindsey v. United States,* 911 A.2d 824, 839 (D.C.2006); *Edelen,* 627 A.2d at 970.

In the context of the present appeal, it is important to recognize that "the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use." *Leka,* 257 F.3d at 100. This is so, in part, because "new witnesses or developments tend to throw existing strategies and preparation into disarray." *Id.* at 101. The sequence of events in this case, like the record in *Leka,* "illustrates how difficult it can be to assimilate new information, however favorable, when a trial already has been prepared on the basis of the best opportunities and choices then available." *Id.* "The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing," and counsel may not be able, on such short notice, to assimilate the information into their case. *Id.* Further, "[t]he more a piece of evidence is valuable and rich with potential leads, the less like-

---

**19.** The judge was generous in his praise for Miller's counsel in relation to the cross-examination of Timothy Taylor.

**20.** Some delay in disclosure may, of course, be appropriate to protect the safety of wit-

nesses (provided that defense counsel is afforded sufficient time to consider any leads and to make use of exculpatory evidence), but the government makes no claim that such a security problem existed here.

ly it will be that late disclosure provides the defense an 'opportunity for use,'" *DiSimone v. Phillips,* 461 F.3d 181, 197 (2d Cir.2006), *i.e.,* "the opportunity for a responsible lawyer to use the information with some degree of forethought." *Leka,* 257 F.3d at 103.

In the present case, the consequences of the government's failure to disclose in timely fashion Taylor's grand jury testimony or its substance must necessarily have begun long before the trial. Until the evening before opening statements, the defense had no inkling of the existence of evidence, coming from the government's principal eye-witness, that the assailant shot Jenkins with his left hand and was therefore probably left-handed. Although the other potential suspects in the case, who were both apprehended in the pick-up truck, were Brandon and Lindsey, and although only Lindsey looked at all like Miller,[21] counsel had no reason before this last-minute disclosure to explore the question whether Lindsey was right-handed or left-handed. With the benefit of Taylor's grand jury testimony, and with counsel surely knowing that Miller was right-handed, the gunman's use of his left-hand would surely have been the focus of the defense's investigation. If this evidence had been disclosed in time to permit Miller's attorneys to contemplate its implications, it is necessarily more likely that they would have discovered, substantially in advance of trial, any definitive evidence that Lindsey was left-handed. Investigation and interviews in the course of preparation for trial could have centered upon this issue and led to the discovery of such evidence.

For example, armed with knowledge of Taylor's grand jury testimony, Miller's attorneys would have been in a position to recognize, well before trial (rather than just after the parties had rested), the significance of the videotape showing Lindsey signing a rights card with his left hand. It would then have been unnecessary to try to convince the trial judge to permit the defense to reopen its case in the middle of the judge's final charge to the jury. With timely disclosure of Taylor's grand jury testimony, the attention of the jurors would have been directed to indisputable evidence that Lindsey used his left hand to sign the card, and that he was therefore probably left-handed—evidence the jury never considered because Miller's counsel realized its value a few hours too late. Further, the videotape of Lindsey signing with his left hand tended to tie in with, and potentially corroborate, Taylor's testimony to the grand jury. The mutually reinforcing combination of these two pieces of evidence suggested that as between Lindsey and Miller, only the former was left-handed,[22] and this would surely have formed the centerpiece of Miller's defense if the prosecution had seasonably disclosed Taylor's statement, in conformity with *Brady,* instead of treating it as *Jencks* material and nothing more.

Pressed by the judge, Miller's counsel admitted fault—perhaps more fault than the record warranted—in failing to notice, until after final instructions, the potentially compelling evidence on the videotape. But for most of the time that the defense was in possession of the videotape, Miller's attorneys had no reason to focus upon what

**21.** The two men were apparently approximately the same age and height and both wore their hair in dreadlocks. Lindsey was, however, significantly heavier than Miller.

**22.** The government agreed that Miller is right-handed. See note 5, *supra.* "About 90 per-

cent of people are right-handed. Most of the rest are distinctly left-handed, though some are ambidextrous to one degree or another." David E. Rosenbaum, *On Left–Handedness: Its Causes and Costs,* New York Times, May 16, 2000, at F1.

would ordinarily have been an irrelevant preliminary portion of Lindsey's police interview, or to notice which hand Lindsey had used to sign the rights card. Until Taylor's grand jury testimony was disclosed, counsel's attention was, and should have been, on the substance of Lindsey's police interview, and not on the mechanics of his signature. In a conventional case involving an allegedly coerced confession, the accused's *demeanor* when signing an incriminating statement might well be relevant, but how often would counsel be likely to focus upon, or even notice, *which hand* the defendant used to sign the incriminating statement? And even if Miller's attorneys should have noticed this unexpectedly important piece of evidence before the defense rested, rather than a few hours later, their "blunder [was] precipitated by the prosecution's failure to discharge its duty under *Brady*." *Leka*, 257 F.3d at 101.

■ "[O]nce trial comes, the prosecution may not assume that the defense is still in its investigatory mode." *Id.* at 100. As the Supreme Court observed in *Banks*, 540 U.S. at 695, 124 S.Ct. 1256, "[o]ur decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." To adapt slightly language from the court's opinion in *Leka*, "the prosecution is in no position to fault the defense for [not spotting the evidence on the videotape in time] when the prosecution itself created the hasty and disorderly conditions under which the defense was forced to conduct its essential business." 257 F.3d at 101. Further, to paraphrase a passage from our opinion in *James*,

> given the fact that upon sufficient reflection after [disclosure of Taylor's grand jury testimony], defense counsel recognized the evidence's relevance to the [identity of the shooter], we see no basis to conclude that, given the same time to reflect before the trial, defense counsel would not have achieved the same insight.

580 A.2d at 643. Accordingly, the court should not

> infer from the failure of defense counsel, when surprised at trial, to seek time to gather other information on [the suppressed evidence], that defense counsel would have by-passed the opportunity had the prosecutor apprised him of the [evidence] at a time when the defense was in a reasonable pre-trial position to evaluate carefully all the implications of that information. Given the time for preparation which counsel was denied by the belated disclosure, it seems to us counsel might have pursued a course of inquiry which would have resulted in ferreting out the relevant ... information.

*Grant v. Alldredge*, 498 F.2d 376, 382 (2d Cir.1974) (citations and internal quotation marks omitted); *accord, Leka*, 257 F.3d at 102.

The trial judge noted, and the government argues, that the belated disclosure of Taylor's grand jury testimony did not impair Miller's opportunity to defend, because Lindsey was a prosecution witness, and because defense counsel could have asked him whether he was left-handed or right-handed. But regardless of the merit (or lack thereof) of "Lord Birkenhead's classic advice that on cross-examination, a barrister should never ask a question unless he knows the answer," *see, e.g., McIntyre v. United States*, 283 A.2d 814, 815 n. 4 (D.C.1971); *Ward*, 21 F.3d at 1362, the opportunity to pose that inquiry while this particular witness was on the stand was hardly equivalent to the proof provided by the videotape. First, Lindsey, as the sole passenger in the pick-up when it was

stopped by the police, was a logical suspect in the shooting, and it would hardly have been to his advantage to acknowledge that he was left-handed if he knew or believed that the gunman used his left hand. Second, Lindsey was demonstrably a man who had lied under oath, either before the grand jury, or at trial, or both. Indeed, it was (and remains) the government's theory that Lindsey's trial testimony, in which he exculpated Miller and professed lack of recollection, was false. We do not think it reasonable for the government to fault the defense for not posing this key question to a patently untrustworthy witness.

▄▄▄ The government argues that the failure of the defense to request a continuance, one which the judge stated that he may well have granted, cured any delay-related impairment of Miller's ability to prepare a defense. We do not agree. A brief continuance [23] could not have undone the mischief caused by the government's belated disclosure. Common sense tells us that if Miller's attorneys had been informed that according to the prosecution's principal eyewitness, the shooter had used his left hand, and if they had also promptly discovered that Lindsey was left-handed, the combination of these two facts would have formed the heart of the defense's investigative and litigation strategy, not in the midst of trial in late June 2007, but from the moment that the information was acquired. The conclusion is inescapable that armed with this knowledge, Miller's attorneys, who were only hours late in spotting Lindsey signing with his left hand, would probably have made this discovery, and would have sought to introduce the evidence, not on the "morning after" the defense rested, but rather, well in advance of "the night before." With timely disclosure, Miller's counsel would have been able to present a coherent theory of the defense, beginning with the opening statement, developed during the presentation of evidence, and wrapped up in closing argument.

▄▄▄ Moreover, the prosecutor ultimately turned over Taylor's grand jury testimony with a package of *Jencks* material. Disclosure in accordance with the *Jencks* Act, as we have seen, is not seasonable disclosure as required by *Brady*. *Edelen*, 627 A.2d at 970–71; *James*, 580 A.2d at 643–44. Accordingly, in such circumstances, "the burden may [not] then be shifted to the defendant, under pain of waiver, to request a continuance or similar remedy." *Perez v. United States*, 968 A.2d 39, 66 (D.C.2009) (quoting *Edelen*, 627 A.2d at 970). As we explained in *James*, imposing upon defense counsel the obligation to request a continuance in order to evaluate the relevance of belatedly disclosed material would be equivalent to holding "that a prosecutor's *Brady* obligations would extend no further than the requirements of the Jencks Act," and that the defense would have to evaluate immediately all potential ramifications of the evidence "or else waive the right to complain later." 580 A.2d at 643. We refused, in *James*, to "read *Brady* or the [D]ue [P]rocess [C]lause so narrowly that they would allow such a result." *Id.* at 643–44.

▄▄▄ It is true that Miller's attorneys did not ask the judge to declare a mistrial after they belatedly learned of Taylor's grand jury testimony regarding the gunman's use of his left-hand to shoot Jenkins. Had the defense attorneys been ideally vigilant, they might have realized at once that their entire trial preparation had

---

**23.** Any continuance would necessarily have been brief, for the jury had already been selected and sworn.

been conducted in a state of ignorance regarding a potentially decisive fact which should have been made known to them long before. Nevertheless, given the time and circumstances of the disclosures, and the defense's persistent assertion of Miller's *Brady* rights, we do not think that the failure to request a mistrial warrants the conclusion that Miller's position has not been preserved for appeal. *See James*, 580 A.2d at 643; *Leka*, 257 F.3d at 101. Indeed, we do not understand the government to be arguing to the contrary. Moreover, given the judge's view of the case and his comparatively tolerant attitude towards belated disclosures, a motion for a mistrial would surely have been futile, and the law generally does not require the doing of a futile act. *In re Melton*, 597 A.2d 892, 907 (D.C.1991) (en banc).

## D. *Whether the Evidence was Material*

There remains the question whether the prosecution's suppression of Taylor's exculpatory testimony before the grand jury was "material" to the outcome within the meaning of *Brady*. In a case such as this, in which there was untimely disclosure rather than non-disclosure, the inquiry into materiality has much in common with the determination whether there was suppression, since each issue turns in large part on whether the defendant suffered substantial prejudice. We conclude that Miller's showing of prejudice meets the materiality standard and therefore requires reversal.

 Evidence is material for purposes of *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.; see also Cone*, 129 S.Ct. at 1783. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. If, as in this case, a *Brady* claim is predicated upon the timing of the disclosure, the defendant must show prejudice from the delay itself. *Perez*, 968 A.2d at 67. "[W]here the defendant receives potentially exculpatory information in time to use it effectively at trial, his conviction will be sustained." *Edelen*, 627 A.2d at 971. "As long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *In re United States v. Coppa*, 267 F.3d 132, 144 (2d Cir.2001).

In the present case, notwithstanding the delay in the prosecution's disclosure of Taylor's exculpatory testimony before the grand jury, the trial jury was apprised of a significant amount of the evidence at issue. Through a hastily improvised cross-examination following receipt of the grand jury testimony late the previous evening, the defense was able to elicit from the witness an acknowledgment that he had twice stated under oath, only weeks after the offense, that the gunman held the weapon in his left hand while he was shooting at Jenkins. The jury also learned that at the time of Miller's trial, Taylor was awaiting trial for a drug offense, and that he therefore had a motive to give evidence favorable to the prosecutor. Although, if there had been seasonable disclosure of Taylor's grand jury testimony, the defense would probably have been able to incorporate the information into its opening statement and to present this key evidence in a more organized, coherent, and persuasive manner, Miller has not demonstrated that the government's delay otherwise seriously

hampered his effort to establish the first part of his eventual double-barreled theme, namely, that the gunman who shot and wounded Jenkins used his left hand and was therefore probably left-handed.

The belated disclosure resulted in far more prejudice, however, with respect to the second part of Miller's submission, namely, that Lindsey—the alternative suspect, and an evident perjurer to boot—was left-handed, and therefore fit Taylor's initial description of the shooter while the right-handed Miller did not. If the defense attorneys had been given any reason to believe, during their pretrial preparation, that the shooter was left-handed, then they could have focused their investigation on whether Lindsey was in the small minority of people whose left hand is the dominant one.[24] There is, at least, a reasonable probability that, given time before the trial began, defense counsel could have conducted interviews and used other investigative techniques which would have revealed without undue difficulty a conclusive answer to this question. Moreover, it is difficult to imagine that able and experienced counsel, focusing upon an alternative suspect who was believed to be left-handed, would have failed to discover more promptly, had they not been preoccupied with the pressures of trial,[25] that in the video that had been provided to them, Lindsey had signed his rights card with his left hand. The video and Taylor's grand jury testimony, taken together, would have rendered far more persuasive Miller's defense that he did not fit the description of the shooter as being left-handed, while Lindsey did.

But without the video or other definitive evidence [26] that Lindsey was left-handed, the theory that would have formed the centerpiece of Miller's pretrial preparation and of his presentation at trial foundered for lack of proof. Before accepting the proposition that Lindsey was left-handed, the jury could reasonably expect the defense to present hard evidence of his left-handedness, rather than mere speculation. If a party is to make a credible showing, "there lies the need for evidence in all its particularity to satisfy the jurors' expectations of what proper proof would be." *Old*

---

24. See note 23, *supra.*

25. It is true that eight days elapsed between the receipt by the defense of Taylor's grand jury testimony and its request to reopen its case and that, because of the long July 4th weekend, there were no trial proceedings during four of those days. Defense counsel did discover the portion of the video showing Lindsey signing left-handed less than a full day too late.

In the midst of a hotly contested felony trial, it is not astonishing that it did not occur even to Miller's able attorneys to look for clues in the mechanics of Miller's signature. Given the essentially undisputed historical facts, we cannot agree with the trial judge's conclusion that counsel's failure to discover that Lindsey signed with his left hand was "entirely" or even primarily the fault of the defense. To sustain that ruling would simply encourage prosecutors to delay disclosure and to take advantage of their own delay.

Further, by failing to disclose Taylor's grand jury testimony until the night before opening statements, when he included it in the government's *Jencks* packet, the prosecutor indicated that he may not have recognized its potentially exculpatory value or his obligation to make disclosure under *Brady*. To fault the defense under these circumstances, for not acting more quickly to realize the full potential of this evidence, by combing through all of the other exhibits that had not previously appeared relevant (*e.g.*, the mechanics of Lindsey's signature on the video) would not be fair or in the interest of justice, particularly given the seriousness of the consequences for the defendant and the apparent failure of the prosecutor to recognize the exculpatory nature of the evidence.

26. Lindsey's pointing to objects, during his testimony, apparently once with his left hand and once with right, was hardly definitive.

*Chief v. United States,* 519 U.S. 172, 188, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). When "[these] expectations are not satisfied, triers of fact may penalize [the proponent] by drawing a negative inference against that party." *Id.* (citation omitted); *see also Benn v. United States,* 801 A.2d 132, 146 (D.C.2002) *(Benn I* ).

In this case, the video showing Lindsey signing the rights card with his left hand would have provided hard evidence to support the defense's suggestion that Lindsey—one of the two occupants of the pick-up truck stopped by police in the wake of the shooting—was left-handed. In conjunction with Taylor's grand jury testimony that the shooter used his left hand (while Miller was *right*-handed), the video would also have supported the defense theory that Taylor was right the first time, that his trial testimony that the gunman shot with his right hand was not correct, and that Lindsey matched the left-handed shooter more than Miller did.

This does not mean that Miller would necessarily have been acquitted if the defense had been able to provide the jury with the video (or with other compelling evidence) that Lindsey was left-handed. We are of the opinion, however, that given the record as a whole, including, *inter alia,* the ample reasons to doubt the truthfulness of some of the testimony of the prosecution's main witnesses, there is a reasonable probability that proof of Lindsey's left-handedness, and, specifically, the indisputable content of the video, would have materially affected the outcome of the trial, and that its exclusion therefore undermines confidence in the reliability of the verdict. Indeed, the prosecutor's rejection of the judge's suggestion of a stipulation regarding Lindsey's signing with his left hand,[27] though perhaps understandable given the stage of the trial and the norms of our adversarial system even in cases such as this, itself indicates that he viewed the evidence as significant and potentially damaging. "If *the admission* of the [videotape] would have been substantially prejudicial to the government, as the prosecutor insisted, then it is difficult to understand why *the exclusion* of the same evidence was not similarly and unfairly prejudicial to the defense." *Andrews v. United States,* 922 A.2d 449, 460–61 (D.C. 2007) (emphasis in original).[28]

The government emphatically disagrees with Miller's claim that a different outcome of the trial would have been "reasonably probable" if timely disclosure had been made. According to the government, the evidence of Miller's guilt was "compelling." The government points to the trial testimony of Brandon and the grand jury testimony of Lindsey, as corroborated by Taylor's testimony that there were three black men in the pick-up truck associated with the shooting and that one of the three later emerged from the elementary school.

27. The prosecutor refused to stipulate even though the judge suggested that the stipulation could state that Lindsey's use of his left-hand to sign the rights did not necessarily mean that he was not right-handed in relation to other activities.

28. In fairness to the government, we recognize that the prosecutor's refusal to stipulate was based on his position that reopening the defense case after jury instructions had begun would unfairly highlight the new evidence, and that Lindsey had been released as a witness and possibly could not have been found in time and recalled to explain the evidence. As we have previously observed, however, and given the undisputed historical facts, the failure of the defense to notice that Lindsey signed with his left hand on the video is more fairly attributable to the government's untimely disclosure than to defense counsel's perceived lack of diligence in discovering this significant fact. In any event, even if Lindsey had testified that he was right-handed, one wonders whether, in light of the videotape and his pronounced credibility problem, the jury would have believed him.

Moreover, the government makes the common-sense argument that if Lindsey had indeed been the assailant, he would probably have adhered at the trial to his grand jury testimony incriminating Miller, rather than effectively describing that testimony as a fabrication and thus casting greater suspicion upon himself.

Nevertheless, we are unable to agree with the government that the adjective "compelling" accurately or even plausibly describes the prosecution's case against Miller. As the government expressly acknowledges in its brief, the prosecution introduced no evidence tending to show that Miller had a motive to kill Jenkins or to harm him in any way.[29] There was likewise no physical evidence linking Miller to the crime. The case for the prosecution thus effectively rests on the testimony of Taylor, Lindsey and Brandon, and collapses if these witnesses are disbelieved.

At trial, Taylor acknowledged, as we have seen, that his recollection of the shooting was better a few weeks after the incident (when he appeared before the grand jury) than it was at trial, fifteen months after Jenkins was shot. If Taylor's initial recollection was correct, and if the assailant shot Jenkins with his left hand, then the right-handed Miller was almost certainly not the shooter. It is true that Taylor contended that the correct version of the event came to his mind later, after his grand jury testimony, and that his change of recollection when he gave evidence at the trial was unrelated to the reality that he was awaiting sentence for a felony, when his future could largely depend on the prosecutor's satisfaction or

dissatisfaction with his testimony against Miller. An impartial juror, however, might well be suspicious of the notion that such a convenient coincidence occurred.

The government's reliance on Lindsey's testimony posed even greater problems. Lindsey told the trial jury, under oath, that his earlier account incriminating Miller was a fabrication. But the government argued to the jury that Lindsey told the truth to the grand jury and lied at trial. This is, of course, possible, but the adjective "compelling" does not, in our view, fairly describe a prosecution case so heavily dependent[30] on the testimony of a witness who has demonstrably lied under oath, on at least one occasion, regarding whether Miller was in the pick-up and involved in the shooting. His testimony, if credited, provided formidable evidence of Miller's guilt.

Brandon incriminated Miller to the police before the grand jury, and again at trial. His testimony, if credited, provided formidable evidence of Miller's guilt. Nevertheless, Brandon too was less than an ideal witness. He was the driver of the pick-up when it was stopped. There was a strong smell of gunpowder in the vehicle. The police handcuffed Brandon, treated him like a prime suspect, and warned him that if he did not identify the shooter, he might well be charged with the crime. In his initial account to the police, Brandon made a number of false statements and misleading omissions. For example, he told the officers that he had never seen Miller before, which was untrue. Brandon failed to mention that he had let Miller

---

**29.** In fact, in conformity with *Brady*, the prosecutor informed the defense early in the trial that upon seeing Miller in the courtroom, Jenkins—the victim of the shooting—stated that he did not know Miller and had never had a dispute with him. Jenkins was not called as a witness by either party, and he did not testify.

**30.** When Lindsey was attempting to avoid having to testify at the trial, the prosecutor remarked on one occasion that the government would have difficulty winning the case or receiving a fair hearing from the jury without Lindsey's testimony.

back into the truck, evidently because he "didn't want to go to jail." Ostensibly fearing retaliation as a "snitch," Brandon also provided a misleading description of the shooter because he did not want to point the police in the direction of any particular person. Moreover, Brandon had a criminal record, having been convicted of theft. Finally, the false statements by Brandon—and, especially, by Lindsey, who plainly lied under oath—also detract from the strength of the government's case, for

> [f]alse exculpatory statements after the commission of a crime may give rise to an inference of consciousness of guilt, from which guilt itself may be inferred. (Citation omitted.).... [This] inference ... *does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting [the] cause.*

*Mills v. United States,* 599 A.2d 775, 783–84 (D.C.1991) (quoting WIGMORE, EVIDENCE, § 278, at 133 (Chadbourn ed. 1979) (emphasis added in *Mills*)).

In sum, the government's case, while legally sufficient to support the verdict, was far from overwhelming. We are persuaded in some measure by the following exposition, in Miller's appellate brief (as slightly edited by the court),[31] of the materiality of the suppressed evidence:

> Had the government disclosed the evidence that the shooter was lefthanded more than a few hours before opening statements, counsel would have had time to obtain indisputable evidence that Ryan Lindsey was indeed left-handed, to develop [their] defense theory in light of the evidence, and to realize sooner what they realized too late given the untimely disclosure: that what at first blush

seemed to be an insignificant part of Ryan Lindsey's videotaped statement— the preliminary procedures and the signing of the waiver form—was actually [powerful evidence] that Mr. Lindsey himself possessed a fairly rare physical characteristic that Timothy Taylor had also attributed to the shooter. But "once trial comes, the prosecution may not assume that the defense is still in the investigatory mode." *Leka,* 257 F.3d at 100.

In a case in which Tyree Miller had no motive to shoot Robert Jenkins, no witness identified him as the shooter, no physical evidence linked him to the offense, and ... the government's best witnesses were extremely flawed, a videotape of Ryan Lindsey signing his name left-handed could have alone turned this trial, and the absence of that evidence from this trial [is a powerful indication] that the government's suppression of evidence "undermines confidence in the outcome of the trial." *Kyles,* 514 U.S. at 434 [115 S.Ct. 1555].

E. *Whether the Trial Judge's Brady Rulings are Entitled to Appellate Deference*

▮ According to our dissenting colleague, our conclusion that the government's belated disclosure of Taylor's testimony before the grand jury was contrary to *Brady* rests on the application of an incorrect standard of review. In Judge Fisher's view, the majority reviews *de novo,* and rejects as errors of law, trial court rulings which, our colleague believes, were in reality findings of fact entitled to appellate deference. Specifically, Judge Fisher takes the position that the trial judge's dispositive determination—namely, that there was no suppression because de-

---

**31.** The passage that we quote is understandably partisan, but we nevertheless generally agree with its substance.

fense counsel, and not the government, were at fault in connection with the lateness (by less than a day) of the defense's effort to introduce the Lindsey video—was a finding of fact which must be sustained unless it was clearly erroneous. We respectfully disagree with our dissenting colleague's conclusion. It is undisputed that the belatedly disclosed evidence was exculpatory, and on this record, we conclude that the judge's ruling that the government did not suppress that evidence must be reviewed under the more searching *de novo* standard. We also conclude, as a matter of law, that the suppressed evidence was material.

 Whether the defendant has established a violation by the government of its obligations under *Brady* presents a mixed question of fact and law. Specifically,

> when a *Brady* violation is alleged, issues of law and fact usually are presented. In that circumstance, we review the [trial] court's legal conclusions on a *de novo* basis and its factual findings under the clearly erroneous standard.

*United States v. Joseph*, 996 F.2d 36, 39 (3d Cir.1993); *see also Farley*, 767 A.2d at 233 (Ruiz, J., dissenting) (*Brady* materiality test presents "a mixed question of law and fact"). In determining what defer-

ence, if any, should be accorded to a trial court's resolution of such a mixed question [of fact and law], we consider, among other things, "whether the issue to be decided more closely resembles one of fact or of law,[32] and whether the trial court or the appellate court is in a position to render the decision with the higher degree of accuracy." *Griffin v. United States*, 618 A.2d 114, 118 (D.C.1992) (citation omitted). Where, as in this case, "[t]he balance we strike between competing interests will not only have consequences for the parties here, but will also provide legal precedent affecting the rights of future litigants ..., [t]his is a significant reason for *de novo* review." *Id.* (citations omitted). Moreover, because the *Brady* issue before us implicates the Fifth Amendment's guarantee of due process of law, "our standard of review calculus must take into account this important reality." *Frederick v. United States*, 741 A.2d 427, 437 (D.C.1999) (citing *Ker v. California*, 374 U.S. 23, 33–39, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), and *Griffin*, 618 A.2d at 118). When "basic liberties are implicated, more searching appellate review is appropriate." *Id.*

In the present case, all of the historical facts relevant to the *Brady* issues—whether the evidence was exculpatory, whether it was suppressed, and whether suppression was material—are undisputed.[33] The

---

**32.** We also generally review *de novo* so-called findings of "ultimate fact" *e.g.*, whether a party's conduct violated a rule or regulation, since they are really conclusions of law. *In re White*, 11 A.3d 1226, 1228 (D.C.2011) (quoting *In re Micheel*, 610 A.2d 231, 234 (D.C. 1992)).

**33.** Judge Fisher relies on our decisions in *Curry* and *Edelen* as authority for deferring to the trial judge's conclusion that there was no *Brady* violation here. In our view, for the reasons set forth below, neither decision is in point.

In *Curry*, the government did not disclose the statement of a potential witness until two days before the initial trial date. The defen-

dant claimed that if timely disclosure had been made, he could have found the witness and presented his testimony. The judge found, however, that this witness had left the area soon after the defendant was indicted, that the witness did not wish to be found, and that earlier disclosure would have made no difference. Because these findings were entirely factual, we held that they must be sustained if there was evidence to support them and, finding no clear error, we affirmed the defendant's conviction. 658 A.2d at 197–98. Our decision rested entirely on the factual nature of the issue, and the issue in *Curry* was quite unlike the one now before us.

*Edelen* was a close and difficult case in which we concluded that "some of the prose-

trial judge was not called upon, in deciding whether *Brady* was violated, to make determinations of credibility or to assess the demeanor of particular witnesses. Rather, there was agreement between the parties as to the events that gave rise to the alleged *Brady* violation. The government points out, and the defense acknowledges, that the video which shows Lindsey using his left hand to sign the rights card was provided to Miller's attorneys well in advance of trial. Miller asserts, and the government agrees, that Taylor's grand jury testimony to the effect that the gunman used his left hand was not disclosed to the defense until the evening before opening statements. Miller also claims, and the government does not deny, that until Miller's attorneys received Taylor's testimony as part of a *Jencks* packet, they had no reason to suspect that the shooter was

left-handed. Further, Miller cannot and does not dispute that eight days (of which four were actual trial days) elapsed between the disclosure of Taylor's testimony to Miller's counsel and the defense's unsuccessful attempt to reopen its case in order to introduce into evidence the portion of the video showing Lindsey signing with his left hand. The government, on the other hand, cannot and does not dispute the fact that the defense was only a few hours late in recognizing the import of this evidence and in seeking to present it.

In light of this broad agreement as to what occurred, the dispute between the parties—and now between the majority and the dissenting judge—concerns the legal consequences of the undisputed historical facts, rather than the facts themselves. The trial judge concluded, with respect to the key question as to who was legally

cution's actions [were] less than exemplary." 627 A.2d at 964. The defendant, Edelen, was seen on the evening of the crime wearing a green jacket. The prosecutor failed to disclose to the defense, until the first day of trial, that a witness had seen Anthony Parks, but not Edelen, wearing a green coat in the area on the night in question. It appears, however, that the witness only disclosed this to the prosecutor on the first day of trial, and the prosecutor promptly conveyed the information to the defense.

The same witness had also testified before the grand jury that she had seen Edelen wearing a white shirt on the evening of the murder. The prosecutor did not provide this information to the defense until the second day of trial. With some reluctance, we affirmed the trial judge's discretionary refusal to declare a mistrial or to grant a continuance, and we sustained Edelen's conviction, noting that there was no reason to believe that earlier disclosure would have made a material difference. We relied in substantial part on the fact that "resourceful and conscientious counsel from the Public Defender Service" had not sought a new trial based on newly discovered evidence while the appeal was pending, *id.*, a reality which tended to verify, after the fact, the trial judge's view that it was unlikely that earlier disclosure would have led to the dis-

covery of additional exculpatory evidence, or would have materially affected the outcome of the trial. By contrast, in the present case, significant evidence favorable to Miller—a videotape of Lindsey signing the rights card with his left hand—was discovered and proffered within hours after the defense rested its case.

The passage from *Edelen* quoted by our dissenting colleague, *post* at 1128, to the effect that the trial judge was in a better position than the appellate court to determine whether the government's delayed disclosure caused prejudice to Edelen, concerned an essentially factual question, namely whether it was reasonably probable, if timely disclosure had been made, that exculpatory evidence (of an unknown nature) would have been found. That discussion did not address a situation like the one before us here, in which it is undisputed that the principal excluded evidence—Lindsey signing with his left hand—was known and proffered within hours after the parties rested, and in which the exculpatory character of that evidence was obvious. Nothing in Edelen suggests that *de novo* review is inappropriate where, as here, the historical facts relevant to the issue whether Miller was prejudiced are undisputed, and where the issue implicates Miller's right to due process of law.

responsible for the defense's failure to introduce the Lindsey videotape into evidence, that there was no suppression, and thus no *Brady* violation, because it was solely the defense attorneys, and not the government, who were at fault. In the judge's view, Miller's attorneys had ample time, in the days following the disclosure of Taylor's grand jury testimony, to focus on the hand with which Lindsey signed the rights card. The judge believed that "late disclosures" are "far better than no disclosures," and that since the defense had eight days to take note of the evidence at issue, the government's delay did not amount to suppression and was legally irrelevant.

But it is indisputable that if the government had not waited until the last moment to disclose Taylor's patently exculpatory grand jury testimony, in contravention of this court's emphatic warnings that "the practice of delayed production must be disapproved and discouraged," *Boyd*, 908 A.2d at 57; *Curry*, 658 A.2d at 197, then the likelihood that the defense could have discovered the Lindsey video in time to use it would have been far greater. After all, discovery of Lindsey's left-handed signing even a few hours earlier would have avoided the problem on which much of this case turns. If Miller's attorneys had known, while preparing for trial, that the shooter was probably left-handed, their investigation would surely have focused on that point, and common sense tells us that Lindsey's use of his left-hand to sign the rights card would not, in all probability, have escaped their attention. *See James*, 580 A.2d at 643; *Grant*, 498 F.2d at 382. This is especially true since notwithstanding the belated disclosure, the discovery was made only a few hours after the defense rested.

How responsibility should be allocated between the parties under such circumstances presents a fundamental issue as to the reach and proper application of the *Brady* doctrine. Whether, on this record, the trial judge correctly concluded that the government did not suppress the evidence, and whether he properly placed all of the blame on the defense without regard to the government's delay,[34] goes well beyond any inquiry into the historical facts. *Griffin*, 618 A.2d at 118. Because the trial judge's ruling that there was no suppression (i.e., that the defense was not prejudiced as a result of the prosecutor's delayed disclosure) necessarily decides the ultimate question of *Brady* materiality, we are not required to accord appellate deference to such a determination.[35] Our resolution of the question before us will undoubtedly "provide legal precedent affecting the rights of future litigants," *id.*, who may claim that the prosecution's disclosure of exculpatory evidence was un-

---

**34.** In his dissenting opinion, *post* at 1129, Judge Fisher asserts that our characterization of the judge's conclusion is "unfair." At page 1130, however, our colleague correctly quotes the judge as stating that "[H]ere, the fault is completely with the defense." At page 1132–33, he notes the judge's remark to defense counsel that "[y]ou can't blame the government for this one."

**35.** This court has stated that trial court rulings concerning *Brady* materiality issues are reviewed for "reasonableness," *see, e.g., Watson v. United States*, 940 A.2d 182, 187 (D.C. 2008), or for abuse of discretion, *cf. Davies v.*

*United States*, 476 A.2d 658, 661 (D.C.1984). We have recognized, however, that in recent decisions applying the rule of *Brady*, the Supreme Court has conducted "an independent review of the evidence, giving little, if any, deference to the trial court's assessment." *Farley v. United States*, 767 A.2d 225, 228–29 (D.C.2001) (citing, *inter alia*, *Strickler* and *Kyles*); *see also Farley*, 767 A.2d at 233–234 (Ruiz, J., dissenting).

Although we need not reach this issue, we do not believe that the judge's finding that the defense alone was at fault, and there was no suppression, would be sustainable even under deferential "clear error" review.

timely and in violation of *Brady*. We are thus called upon to decide whether the conclusion that there was "no suppression" is correct where, in this case, as in *Grant*, 498 F.2d at 382, the government's delayed disclosure has hindered the defense from pursuing a course of inquiry which might well have "ferreted out" the necessary information in time to use it effectively. That is assuredly a question that goes to the heart of the protections which secure the due process right to the timely disclosure of exculpatory evidence. The legal consequences of our resolution of that question go far beyond the facts of this appeal.

In this case, we have a situation in which critically important defense evidence was excluded because, arguably, counsel for *both* parties were at fault—the government, for an unjustified delay in disclosure, and the defense, for not recognizing quite quickly enough, under the pressures of trial, the exculpatory evidence which the Lindsey video provided. The application of the *Brady* doctrine to such circumstances implicates fundamental legal policy concerns which are quite different from a determination whether a trial judge's findings of fact were "clearly erroneous." These concerns are far more suited for ultimate resolution by an appellate court, which is responsible for establishing legal precedent, than for the trial judge, whose responsibilities are of a different and more case-specific character. The deference appropriately accorded to a trial court's resolution of disputed facts would, in our view, be entirely misplaced where, as here, the issue is not about who is telling the truth but, on the contrary, relates to the appropriate legal (and constitutional) consequences of undisputed facts.

Miller is a very young man. He has already been incarcerated for several years on the basis of legally sufficient but less than overwhelming evidence. He has presented the trial court and this court with a substantial claim that his due process rights were violated. We are obliged to review the merits of Miller's constitutional claim *de novo,* based on the historical facts, which in this case are undisputed, without according appellate deference to the trial judge's key rulings. Having done so, we conclude that the government suppressed material[36] exculpatory evidence in violation of *Brady,* and that the trial judge erred in holding to the contrary.

## IV.

### CONCLUSION

For the foregoing reasons, Miller's convictions are reversed, and the case is remanded to the trial court for a new trial.

*So ordered.*

FISHER, Associate Judge, dissenting:

When analyzing appellant's claim that the government violated its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), it is important to keep two points firmly in mind. First, appellant does not deny that the videotape itself was disclosed in a timely fashion; he concedes that defense counsel "had received from the government, and carefully reviewed, Ryan Lindsey's videotaped police statement." Second, although he vigorously complains about the delayed disclosure of Taylor's grand jury testimony, appellant made effective use of that transcript the very next day. Nevertheless, appellant asserts that the government is responsible for (the government caused) defense counsel's failure to introduce the portion of the Lindsey videotape at issue here.

**36.** For the reasons stated in Part III D of this opinion, we are of the opinion that the suppressed evidence was material as a matter of law.

The trial court had a contrary view of this fact-bound question, and its judgment is amply supported by the record. In my opinion, the majority reaches the wrong conclusion by applying the wrong standard of review.

## I. Background to the *Brady* Claim

More than a year before trial, Mr. Miller asked the government to disclose all exculpatory information, including "any description(s) of the perpetrator of the alleged offense which in some material respect . . . differs from Mr. Miller" and "[a]ny prior inconsistent, non-corroborative, or other witness statements which the witness'[s] trial testimony will not reflect." Mr. Taylor, who testified at trial that the shooter held the gun with his right hand, told the grand jury that the shooter had used his left hand. The government disclosed this grand jury testimony to defense counsel on the evening before opening statements were scheduled to begin, in a set of Jencks Act disclosures.[1]

The defense used Mr. Taylor's grand jury testimony the next afternoon. After Mr. Taylor testified that the shooter had used his right hand, the defense impeached Taylor with his prior testimony that the shooter had used his left. When the government inquired further on redirect the next morning, the defense impeached Taylor on this issue a second time. Although defense counsel sought sanctions for the delay in disclosing the grand jury transcript, they had made no request to delay their examination of Mr. Taylor. The trial court commented that "had you requested that Mr. Taylor's examination be delayed so you could work it in, I would have considered it. I saw no evidence whatsoever that you were unable to use [the grand jury transcript] effectively in the examination of Mr. Taylor." When the issue arose again the following week, the trial judge commented that the defense had made "very effective use" of the grand jury testimony in cross-examining Taylor on the "left-handed versus right-handed" issue.

Despite cross-examining Mr. Taylor on the first day of testimony about which hand the shooter had used, the defense did not raise the issue of Mr. Lindsey's handedness[2] until a week later, on the afternoon of the last day of testimony. After Mr. Lindsey pointed to an exhibit, defense counsel asked that the record reflect that he had used his left hand. The prosecutor, who had not seen which hand the witness had used, objected on relevance grounds and was overruled. Approximately eighteen questions later, Mr. Lindsey again pointed at the exhibit. This time the court directed that the record reflect that Lindsey had used his right hand, a point the defense conceded. However, the judge

---

1. Defense counsel spoke with Mr. Taylor before opening statements were given, but appellant represents that "Mr. Taylor did not tell them that the shooter was lefthanded or that he had told the grand jury he was left-handed."

2. The use of the awkward term "handedness" to describe the tendency to use one hand rather than another is rare but not unheard of in legal opinions. *See, e.g., Harris v. Anaconda Aluminum Co.,* 479 F.Supp. 11, 47 (N.D.Ga.1979) ("the knowledge of the 'handedness' of the doors"); *Commonwealth v. Burts,* 68 Mass.App.Ct. 684, 864 N.E.2d 562,

563 (2007) ("the 'handedness' of the assailant"). Nevertheless, it is the scientific term. *See, e.g., People v. Steele,* 27 Cal.4th 1230, 120 Cal.Rptr.2d 432, 47 P.3d 225, 256 (2002) (The scientist "testified that control groups for the BEAM test . . . were based upon age, gender, and handedness."); S. Knecht *et al., Handedness and Hemispheric Language Dominance in Healthy Humans,* 123 BRAIN 2512 (2000); R.C. Oldfield, *The Assessment and Analysis of Handedness: The Edinburgh Inventory,* 9 NEUROPSYCHOLOGIA 97 (1971); *see also* Handedness Research Institute (June 14, 2010), http://handedness.org/institute.html (Indiana University).

also stated that he was not certain whether Lindsey had used his left hand on the first occasion and told the jurors that their recollection would control.

Defense counsel did not ask Mr. Lindsey which hand he had pointed with, or whether he was left-handed. That same afternoon the defense rested, the trial judge started final jury instructions, and he released Mr. Lindsey from high-intensity supervision.[3] That night, defense counsel once again reviewed the videotape of Mr. Lindsey's interrogation by the police and saw that Lindsey had signed his *Miranda* waiver card with his left hand.

The next morning defense counsel moved to reopen evidence in order to show that portion of the videotape, claiming that the government's delay in disclosing the grand jury testimony of Timothy Taylor prevented them from recognizing the videotape's relevance as demonstrative evidence suggesting that Mr. Lindsey was the shooter. The government objected that admitting the videotape after jury instructions would call undue attention to the matter, and that the government would need to recall Lindsey, who had been released. See *supra* note 3. Noting that the videotape had been in the defense's possession since well before trial, that excerpts from the videotape had already been played during trial, that the issue of which hand the shooter used had been raised prior to Lindsey's appearance on the stand, that the defense had failed to ask Lindsey about his handedness, that the government would be prejudiced by unfairly highlighting the video, and that the government would not be able to ask Mr. Lindsey questions about which hand

he used for what purposes, the judge denied the motion.

## II. *Brady* and Disclosures Prior to Trial—Governing Principles

Due process is violated where "evidence ... material either to guilt or to punishment" is suppressed by the prosecution. *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. 1194. "It is now well settled that the prosecution must disclose exculpatory material 'at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pretrial disclosure.'" *Edelen v. United States,* 627 A.2d 968, 970 (D.C. 1993) (quoting *United States v. Pollack,* 175 U.S.App.D.C. 227, 236, 534 F.2d 964, 973 (1976)).

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Materiality, "hence prejudice," *Bennett v. United States,* 763 A.2d 1117, 1125 n. 9 (D.C.2000), is shown "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell,* —— U.S. ——, 129 S.Ct. 1769, 1783, 173 L.Ed.2d 701 (2009).

It is appellant's burden to establish each of these three prongs. *United States v. Wright,* 506 F.3d 1293, 1301 (10th Cir.

---

**3.** Mr. Lindsey had been arrested on a material witness warrant more than five months before trial, and was required to wear an ankle bracelet in order to secure his presence at trial. Mr. Lindsey testified that he "was on the run" from this case. The court notified both counsel during Mr. Lindsey's testimony

that it would be releasing Lindsey from the high intensity supervision program when he finished testifying, and specifically asked if there were any further questions that counsel wished to ask. Receiving no objection, the judge released Lindsey at the completion of testimony on Thursday.

2007); *Gillard v. Mitchell,* 445 F.3d 883, 894 (6th Cir.2006); *Fullwood v. Lee,* 290 F.3d 663, 685 (4th Cir.2002). If evidence is not exculpatory (or impeaching), there is no *Brady* violation.[4] If the evidence is not material, there is no *Brady* violation.[5] And if exculpatory evidence was not suppressed, the *Brady* doctrine was not violated.[6]

Before applying these principles, I feel obliged to comment on the majority's quotations from the ABA Standards and the United States Attorneys' Manual. The discussions of the *Brady* doctrine in these sources do not properly guide our analysis here. Compliance with the *Brady* doctrine is a requirement of due process and it is for the courts, not a voluntary bar association (no matter how prominent or respected), to determine the scope of that constitutional obligation. As the Supreme Court has explained, "the rule in *Bagley* [7] (and, hence, in *Brady* ) requires less of the prosecution than the ABA Standards for Criminal Justice...." *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Indeed, as the Chief Justice cautioned in similar circumstances, "[t]he

ABA standards are wholly irrelevant to the disposition of this case, and the majority's passing citation of them should not be taken to suggest otherwise." *Cone v. Bell,* 129 S.Ct. at 1787 (Chief Justice Roberts, concurring in the judgment).[8]

The United States Attorneys' Manual (USAM) provides internal guidance to Department of Justice employees, but it does "not create enforceable rights for criminal defendants." *United States v. Wilson,* 413 F.3d 382, 389 (3rd Cir.2005);[9] *accord, United States v. Blackley,* 334 U.S.App. D.C. 306, 311–12, 167 F.3d 543, 548–49 (1999); *United States v. Lee,* 274 F.3d 485, 493 (8th Cir.2001). *See United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). "As [with the IRS guidelines] in *Caceres,* the guideline[s] [of the Department of Justice are] of the kind to be enforced internally by a governmental department, and not by courts." *In re Grand Jury Proceedings No. 92–4,* 42 F.3d 876, 880 (4th Cir.1994) (internal quotation marks and citation omitted).

None of this is to suggest in the slightest that prosecutors should disregard the

---

4. *E.g., Ingram v. United States,* 976 A.2d 180, 193 (D.C.2009) (denying *Brady* claim because information was not exculpatory and thus not material).

5. *E.g., Brooks v. United States,* 396 A.2d 200, 203–04 (D.C.1978) (denying *Brady* claim, without deciding whether suppression had occurred, because defendant suffered no prejudice).

6. *E.g., Wright v. United States,* 979 A.2d 26, 31 (D.C.2009) (denying *Brady* claim because "the government did not suppress the materials or information on which appellant bases his claims"); *Wiggins v. United States,* 386 A.2d 1171, 1175 (D.C.1978) (Ferren, J., concurring) ("[W]e hold that the exculpatory evidence ... was not 'suppressed' within the meaning of *Brady* ... and its progeny.... Thus, we do not reach the question whether there was reversible error under *Brady* for failure to produce 'material' evidence.").

7. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

8. As far as ethical obligations are concerned, the relevant standard is to be found in the Rules of Professional Conduct adopted by this Court. Referring to *Brady* and other responsibilities of a prosecutor, comment [1] to Rule 3.8 explains, as the majority acknowledges, that that "rule ... is not intended either to restrict or to expand the obligations of prosecutors derived from the United States Constitution, federal or District of Columbia statutes, and court rules of procedure."

9. "The Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal." USAM § 1–1.100.

sound policies set forth in the United States Attorneys' Manual or that they may begrudgingly apply the *Brady* doctrine. It is important, however, that we accurately identify the governing principles before setting out to determine whether the requirements of *Brady* have been violated in this case.

### III. Delay May Amount to Suppression

Even if the government has disclosed exculpatory evidence in its possession, a defendant may succeed in establishing that suppression occurred if the disclosure came so late that he was unable to use the information effectively. *See United States v. Douglas,* 525 F.3d 225, 245 (2d Cir.2008) ("*Brady* material that is not 'disclos[ed] in sufficient time to afford the defense an opportunity for use' may be deemed suppressed within the meaning of the *Brady* doctrine.") (quoting *Leka v. Portuondo,* 257 F.3d 89, 103 (2d Cir.2001)); *Boss v. Pierce,* 263 F.3d 734, 740 (7th Cir.2001) ("Evidence is suppressed for *Brady* purposes only if (1) the prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence."). "But 'as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner.'" *Douglas,* 525 F.3d at 245 (quoting *In re United States (Coppa),* 267 F.3d 132, 144 (2d Cir.2001)).

An appellant does not carry his burden of proving that evidence was suppressed merely by showing that he did not use the evidence effectively. *See, e.g., Collier v. Davis,* 301 F.3d 843, 850–51 (7th Cir.2002) (Petitioner did not meet his burden of proving suppression where the government disclosed prior to trial the possibility of "an implied bilateral understanding of prosecutorial leniency" toward a witness, and the defendant "could have fully explored this topic in cross-examination of [the witness] at trial—but did not do so."); *United States v. Dean,* 312 U.S.App.D.C. 75, 99, 55 F.3d 640, 664 (1995) (Appellant did not show that delayed disclosures had "materially prejudiced her defense" where she "effectively used, *or had an opportunity to use,* all the late-disclosed or unsegregated exculpatory evidence at trial.") (emphasis added). Typically, cases involving delayed disclosure present an issue of causation: if the delay in disclosing evidence did not cause the failure to present it, the evidence was not suppressed. *E.g., United States v. O'Hara,* 301 F.3d 563, 569 (7th Cir.2002) ("The evidence at issue here was not suppressed at all. Though discovered during trial, O'Hara had sufficient time to make use of the material disclosed."); *United States v. Walton,* 217 F.3d 443, 451 (7th Cir.2000) ("[W]e are of the opinion that the government's delayed disclosure of the remaining phone records did not come so late as to deny [appellant] ... the evidence's 'effective use' at trial, had he chosen to do so.").

### IV. The Nature of Our Inquiry

When a *Brady* claim rests on delayed disclosure, courts, including this one, frequently resolve the issue by focusing on whether the delay was "material" or "prejudicial." *See, e.g., James v. United States,* 580 A.2d 636, 644 (D.C.1990) ("The issue here is ... whether the timing of the government's disclosure ... violated appellant's due process rights because the timing of the disclosure was 'material' to the outcome."); *Bellanger v. United States,* 548 A.2d 501, 503 (D.C.1988) (denying *Brady* claim because "appellant has not demonstrated any prejudice by the delay in receiving [the disclosure]"); *United States v. Burke,* 571 F.3d 1048, 1056

(10th Cir.2009) ("To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial."). In substance, this approach conflates *two* prongs of the *Brady* analysis: (1) whether the government's delay in disclosing the evidence is the reason it was not presented or was not used effectively, *and* (2) whether the defendant was prejudiced (whether there is a "reasonable probability ... that the outcome of the proceeding would have been different" had exculpatory evidence been presented to the jury). As discussed, the former inquiry is another way of asking whether the evidence was suppressed. Determining the answer to that question is predominantly a fact-bound inquiry.

We confronted a similar issue in *Curry v. United States*, 658 A.2d 193 (D.C.1995), where the government disclosed a witness's statement two days before the initial trial date. *Id.* at 195. Defense counsel was unable to locate the witness, and he "argued that if timely disclosure had been made, the defense could probably have located Jones [the witness] and presented his testimony at trial." *Id.* at 196. However, the trial judge found "that even if the government had disclosed Jones' statement to the defense soon after the return of the indictment, such disclosure would have made no difference, for Jones had already left the area by then and did not wish to be located." *Id.* at 197. Recognizing that "[t]he judge's finding was essentially a factual one," we acknowledged our obligation to "sustain it if there is evidence in the record to support it." *Id.* at 198 (citing D.C.Code § 17–305). We could not say the finding was clearly erroneous and therefore held that there was no *Brady* violation. *Id.*

Likewise, in *Edelen v. United States*, 627 A.2d 968 (D.C.1993), the defendant argued that he was entitled to a new trial "because the prosecution provided him with requested exculpatory materials too late for their effective use at trial, and because the trial judge refused to take remedial action to protect [his] rights." *Id.* at 969. "We emphasize[d] that Edelen's claim of a *Brady* violation [was] not a frivolous one[,]" but concluded that "[t]here was no persuasive reason for the trial judge to believe that earlier disclosure, or a brief continuance, would have significantly altered the posture of the case before the jury." *Id.* at 971, 972.

> [T]he trial judge was on the scene. He was in a far better position than we are to assess the atmospherics of the case and to determine whether, given all that had occurred, Edelen's defense was appreciably prejudiced by any delay in the disclosure to counsel of the color of the clothing allegedly worn by Pate and Edelen on the night of the murder.

*Id.* at 972. *See also United States v. Paxson*, 274 U.S.App.D.C. 71, 78, 861 F.2d 730, 737 (1988) (applying the clearly erroneous standard in affirming the trial judge's determination, "after a careful and thorough examination of the subject, ... that the defense had in fact received the evidence in time to make effective use of it, and ... had based a thorough and effective examination ... on the very evidence as to which this question is now raised.")

In this case, we similarly benefit from the analysis of the trial judge, who was on the scene, and we must defer to the factual components of his ruling. *Cf. (Milton) Davis v. United States*, 564 A.2d 31, 42 (D.C.1989) (en banc) (recognizing that proper standard of review often combines "de novo" review of legal judgment with application of "clearly erroneous" standard to the trial court's findings of evidentiary and subsidiary facts and the inferences drawn therefrom);[10] *Odemns*

---

10. In terms that are instructive here, we ex- plained in *Davis* our concerns when seeking

*v. United States*, 901 A.2d 770, 776 (D.C. 2006) (when applying the "abuse of discretion" standard to the admission of an excited utterance, "underlying factual findings are reviewed under the 'clearly erroneous' standard").

I find the majority's attempt to distinguish our decisions in *Curry* and *Edelen* to be entirely unpersuasive, as is its effort to reformulate the question the trial court addressed—whether the defense received the exculpatory material too late to allow effective use of it at trial. Moreover, it is, in my view, unfair to suggest that the trial court thought the government's delay "was legally irrelevant," *ante* at 1122, or that he "placed all of the blame on the defense without regard to the government's delay...." *Ante* at 1122–23. As I explain in more detail below, the trial judge made a carefully considered, fact-bound determination that is not clearly erroneous.

Appellant's central argument is that the delay in disclosing the grand jury testimony of Taylor caused his failure to make timely use of a segment of the Lindsey

videotape. We therefore must focus on whether appellant has carried his burden of showing suppression (meaning, in this context, causation). In my view, that issue is dispositive, and the court need not reach the prejudice (materiality) prong of the *Brady* analysis. *See United States v. Lemmerer*, 277 F.3d 579, 588 (1st Cir.2002) ("[I]n delayed disclosure cases, we need not reach the question whether the evidence at issue was 'material' under *Brady* unless the defendant first can show that defense counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case.").[11]

## V. Was the Evidence Suppressed?

I find it intriguing that the jury did not hear evidence that appellant Miller is right-handed. Perhaps the defense feared that the jury would credit Taylor's testimony that the shooter used his right hand. If the jury so concluded, the defense obviously would not enhance appellant's prospects of acquittal by proving or

to identify the proper standard of review: "On the one hand, we wish to avail ourselves of the unique operational advantage of the trial judge in making a determination requiring intimate acquaintance with the facts of the particular case as they evolved at trial. On the other hand, we seek to maintain our own role as primary expositor of law by applying a sufficiently penetrating measure of review to a trial court decision that, in effect, construes a legal right by denying its remedy." 564 A.2d at 34.

11. Although this court historically has reviewed a trial court's rulings on *Brady* materiality for "reasonableness," *see, e.g., Watson v. United States*, 940 A.2d 182, 187 (D.C.2008); *Powell v. United States*, 880 A.2d 248, 254–55 (D.C.2005), Judge Ruiz has suggested that a *de novo* standard of review should be used because it "is consistent with the origin of the *Brady* materiality test, which is derived from the prejudice prong for ineffective assistance of counsel-an inquiry which the Court has held presents a mixed question of law and

fact." *Farley v. United States*, 767 A.2d 225, 233 (D.C.2001) (Ruiz, J., dissenting). We need not resolve that issue here. It is useful to note, however, that many federal circuits which apply a *de novo* standard of review to *Brady* claims recognize that issues of fact often are presented. *See, e.g., United States v. Joseph*, 996 F.2d 36, 39 (3rd Cir.1993) ("[W]hen a *Brady* violation is alleged issues of law and fact usually are presented. In that circumstance, we review the district court's legal conclusions on a *de novo* basis and its factual findings under the clearly erroneous standard."); *United States v. Severns*, 559 F.3d 274, 278 (5th Cir.2009) (*de novo* review of the denial of a motion for a new trial based on alleged *Brady* violation, but "proceed[ing] with deference to the factual findings underlying the district court's decision"); *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir.2009) (reviewing *de novo* denial of a *Brady*-based motion for a new trial, while accepting district court's findings of historical fact unless clearly erroneous).

by stipulating that Miller is right-handed. Nevertheless, both parties seemed to agree during trial that this is so. Therefore, an eyewitness statement that the shooter used his left hand was more than impeaching-it was exculpatory in nature. The government thus should have disclosed this portion of Taylor's grand jury testimony (or at least its substance) sooner.[12] "[A] prosecutor's timely disclosure obligation with respect to *Brady* material can never be overemphasized, and the practice of delayed production must be disapproved and discouraged." *Boyd v. United States*, 908 A.2d 39, 57 (D.C.2006) (internal quotation marks and citation omitted). Nevertheless, "[i]t is not feasible or desirable to specify the extent or timing of disclosure [that] *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made." *Leka*, 257 F.3d at 100.

### 1. The Trial Court's Ruling

Appellant contends that, because the government disclosed Taylor's grand jury testimony only the night before trial, defense counsel did not have time "to contemplate its implications." He complains, in other words, that the defense did not have time to recognize possible linkage between two pieces of information in its possession—(1) the recently disclosed (but disavowed) statement that the shooter used his left hand and (2) the videotape of Lindsey's interrogation, a portion of which could be used as demonstrative evidence that Lindsey used his left hand to sign the *Miranda* card. In short, appellant claims that the delay in disclosing Taylor's grand jury statement "did not remotely permit" appellant's attorneys to use the "evidence that the shooter was left-handed ... effectively," and that this delay constituted suppression, the second prong of a *Brady* violation.

The trial judge had a contrary view: "Here the fault is completely with the defense." "Several days after handedness became an issue, several days after [defense counsel] made good use of left-handed versus right-handedness at trial in cross-examining Timothy Taylor, ... I can't see how over a passage of days you could not have thought about that issue." "There has been no change except the defense has suddenly thought of additional evidence it would introduce." The court found that the government had neither caused defense counsel's failure to use the video in this fashion nor prevented the defense from introducing other evidence of Mr. Lindsey's handedness. On the record presented, these determinations by the finder of fact are not clearly erroneous.

### 2. Appellant Was Not Forced to Change His Trial Strategy

Appellant primarily relies on *Leka v. Portuondo*, 257 F.3d 89 (2d Cir.2001), in which both the manner and timing of a pretrial disclosure led the court to conclude that the information had been suppressed. In that case the government had altogether refused to disclose an eyewitness's exculpatory statements, *id.* at 98; did not call the eyewitness at trial after

---

**12.** It is not clear when the prosecution learned that the shooter used (or may have used) his right hand, making Taylor's grand jury testimony exculpatory. Perhaps the prosecutor was surprised by Taylor's trial testimony that the shooter used his right hand. Moreover, as appellant acknowledges, the prosecutor did not recognize that Mr. Lind-sey's handedness was at issue. Perhaps he should have foreseen this possibility, but there is no basis for suggesting here that the government delayed turning over the grand jury testimony because it "considered that disclosure of the evidence would weaken its case." *Shelton v. United States*, 983 A.2d 363, 372 n. 19 (D.C.2009).

representing that it would do so, *id.* at 94; and disclosed, nine days before opening statements, only the identity of that eyewitness, *id.* at 100. Despite the fact that the defense had a chance to interview the eyewitness, which "it bungled ... by a deceptive and aggressive maneuver," *id.* at 101, the court held that the government had "failed to make sufficient disclosure in sufficient time to afford the defense an opportunity for use." *Id.* at 103. The *Leka* court noted that the closer a disclosure comes to trial, the less opportunity the defense has to use the information, *id.* at 100, because defense counsel may be "unable to divert resources from other initiatives and obligations that are or may seem more pressing," *id.* at 101, especially where a limited disclosure "could have led to specific exculpatory information only if the defense undertook further investigation." *Id.* Moreover, if a disclosure comes close to trial, it may "tend to throw existing strategies and preparations into disarray," and defense counsel may be unable to assimilate the information into its case. *Id. See also United States v. Lemmerer,* 277 F.3d 579, 588 (1st Cir.2002) ("The principal concern in such cases [of delayed disclosure] is whether the failure to supply the information in a seasonable fashion caused the defense to change its trial strategy." (internal quotation marks and citation omitted)).

Nothing in Taylor's grand jury testimony or the Lindsey videotape threw "existing strategies and preparations into disarray," either by forcing a change in strategy or by coming too late to permit such a change. In defendant's opening statement counsel emphasized that Ryan Lindsey and Alvin Brandon had been stopped after fleeing in a pickup truck

that matched the description of the one at the scene, that the pickup truck smelled of gunpowder, and that there was no physical evidence that Mr. Miller had been in the vehicle. He concluded by asserting that Brandon and Lindsey "came up with stories [blaming appellant] that ... accommodate the overwhelming evidence pointing directly at them." On appeal Mr. Miller acknowledges that the "defense was focused on Ryan Lindsey as the real shooter...."[13] Because the Lindsey videotape was consistent with his theory of the case, appellant has failed to show that it "[threw] existing strategies and preparations into disarray." *Leka,* 257 F.3d at 100.

### 3. Appellant Had Time to Assimilate the Information

Nor has appellant established that he was prevented from using the videotape by resource limitations or the time pressures of trial. There were four days of testimony in this trial: Thursday, June 28, and the following Friday, Tuesday, and Thursday. Appellant was represented by two attorneys and, after the trial started, there were four days with no trial proceedings: Saturday, Sunday, Monday, and Wednesday (the Fourth of July). Defense counsel reviewed the videotape well before the trial started, and they became very familiar with the tape, having observed the government playing four portions for the jury on Tuesday, July 3, and themselves playing seven portions of the videotape on Thursday, July 5. Defense counsel knew on the first day of testimony that the handedness of the shooter was in question and that their theory of the case was that Mr. Lindsey had committed the shooting (perhaps with Mr. Brandon's knowing assistance).

13. This theory was self-evident. The judge remarked to the defense at a hearing three days before trial "that if you had a case in which two people are stopped with the smell of gunpowder in the car, if I were defending the case I would say it's one of those two people who did it, not my client[,] if the client wasn't in the car."

And defense counsel found the section of the videotape which showed Mr. Lindsey signing his name the same evening they started to look for it. Defense counsel thus had four days off during trial (plus overnight recesses) in which to locate evidence they found in one night, on a videotape that they had viewed before trial and that they played repeatedly during trial.[14] The strategic considerations and the time pressures that were significant in *Leka* were not present here.

### 4. Our Decision in *James* is Readily Distinguishable

In his brief, appellant relies upon our decision in *James v. United States*, 580 A.2d 636 (D.C.1990), which he claims "controls this appeal." In that case a witness statement that, with the benefit of hindsight, was relevant to a hearsay ruling made on the third day of trial was not disclosed by the government until the fifth day of a six-day trial. *Id.* at 638.[15] The threshold issue was whether the appellant had forfeited his right to pursue the *Brady* issue on appeal by failing to raise it at the time the witness statement was disclosed. *Id.* at 642. Declining, where Jencks Act material is disclosed mid-trial, to impose upon defendants the burden of "evaluat[ing] the evidence's relevance to every *previous* evidentiary ruling in the trial or else waiv[ing] the right to complain later," *id.* at 643 (emphasis added), we allowed the appellant to proceed with his *Brady* objection. *Id.* at 644. Because the statement had been disclosed *after* the evidentiary ruling, we held (essentially as a matter of law) that defense counsel did not

have an opportunity to make effective use of it.

Given "the unusual procedural posture of [the] case," 580 A.2d at 646, however, we did not decide the *Brady* issue. Recognizing that the hearsay question could not be resolved as a matter of law, *id.*, we remanded the record so the trial court could determine "whether Augustine's statement to Baptiste would still have been admitted as a spontaneous utterance had the court known about Augustine's previous statements to Bowman." *Id.* Because the record was being remanded, we also sought "the trial court's ruling on the [*Brady*] materiality question in the event that the court determines its evidentiary ruling would have been different." *Id.* at 647.

Three things are clear about our opinion in *James*. First, we did not hold that there had been a *Brady* violation. Second, we did not announce a general rule that we will deem suppression to have occurred whenever defense counsel belatedly recognizes the relevance of evidence that has actually been disclosed. And, third, *James* does not control this appeal because in this case both the videotape and the grand jury transcript were disclosed *before* testimony began, and because the issue of suppression—whether counsel had an opportunity to make effective use of the information—is a factual question.

### 5. The Evidence Was Not Suppressed

The trial judge in this case found that the government did not cause the failure of the defense to use the videotape, stating: "You can't blame the government for this

---

14. *Cf. United States v. Peters*, 732 F.2d 1004, 1009 (1st Cir.1984) ("We hold that the disclosure at trial of the *Brady* material did not prejudice defendants. They had two full days, including one nontrial day, in which to prepare to cross-examine Fallon with regard to his grand jury testimony, which was short, uncomplicated, and fairly predictable. De-

fendants also had nine days between disclosure and the end of trial.").

15. We found "no basis to conclude that the prosecutor recognized the evidence's relevance to the spontaneous utterance issue and intentionally withheld the evidence from the court." 580 A.2d at 642 n. 10.

one." In reaching that decision the court explained that the defense was "well aware" of the issue of handedness for days prior to Mr. Lindsey's testimony and that defense counsel had, "with great skill," cross-examined Mr. Taylor about his conflicting testimony concerning which hand the shooter had used. The court also stated that this was not a case of newly discovered evidence. Defense counsel had the videotape "well before trial," and they had played it at trial. The only change was that "the defense has suddenly thought of additional evidence it would introduce."

What triggered counsel's thought processes? Apparently it was Lindsey's use of his hands while testifying. Defense counsel explained: "[T]here is a portion of the tape that we've never focused on because it was all preliminary to [Lindsey's] interview. But after his testimony on the stand yesterday, it became a burning question." In light of this acknowledgment, it is entirely speculative to suggest that the defense would have focused on the preliminary portion of the videotape at an earlier time if only the government had disclosed Taylor's grand jury testimony sooner.

The trial judge thus rejected the argument that the government had caused defense counsel's failure to introduce a portion of the videotape or other evidence of Mr. Lindsey's handedness. Given that defense counsel received the grand jury testimony on the eve of trial but effectively used that testimony in cross-examining Mr. Taylor the next day, and given that there were four days of recess thereafter,

we cannot say that the judge's finding was clearly erroneous. Moreover, for the reasons discussed above, this finding amounts to a ruling that the evidence was not suppressed. There is, therefore, no *Brady* violation. *See Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

## VI. The Trial Court Did Not Abuse Its Discretion

Because there was no *Brady* violation that required a remedy, we should apply our customary standards for determining whether the trial judge's decision not to reopen evidence was an abuse of discretion. *See Shelton v. United States*, 983 A.2d 979, 987 (D.C.2009) ("Whether to permit a party to reopen its case after the close of the evidence is a question within the trial court's sound discretion, and its decision will not be disturbed unless the court is shown to have abused its discretion."). In exercising that discretion the court should consider, among other factors, the prejudice that the opposing party will suffer. *Diaz v. United States*, 716 A.2d 173, 182 (D.C.1998). The trial judge found here that the government would be unfairly prejudiced by introducing and highlighting the videotape after the start of final jury instructions, that it would be unfair to introduce the videotape without giving the government an opportunity to question Lindsey, that the prosecutor could not get Lindsey back quickly, and that the defense had failed to use the alternative of just asking the witness whether he was left-handed.[16] Based on

---

**16.** Appellant argues that "[d]efense counsel cannot fairly be faulted for forgoing the risk of asking Ryan Lindsey which hand was his dominant hand...." It is, to be sure, a good rule of thumb that a trial attorney should refrain from asking a question on cross-examination unless he knows the answer, but following that rule without exception is a luxury counsel sometimes cannot afford. Moreover, "[e]very experienced trial lawyer realizes that

that rule is honored more in the breach than the observance." *Ward v. Whitley*, 21 F.3d 1355, 1362 (5th Cir.1994). More importantly, this is a maxim of trial tactics, not a demand of due process. In this case, however, we do not know whether Lindsey would have provided an answer as favorable to the defense as what the videotape appeared to show. Thus, the crucial question is whether the govern-

this record, the trial judge did not abuse his discretion when he declined to reopen evidence, and we therefore should not disturb that decision.[17] *See (Faouly) Davis v. United States,* 735 A.2d 467, 472 (D.C. 1999) ("The belated receipt of ... testimony should not imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered." (internal quotation marks and citation omitted)); *Curry,* 658 A.2d at 199 ("Assuming that the trial judge had the authority to admit a potentially powerful hearsay statement into evidence [to remedy a delayed disclosure by the government], we cannot say that he was legally obliged to do so."); *Furtado v. Bishop,* 604 F.2d 80, 95 (1st Cir.1979) ("It was within the trial judge's discretion to deny a motion to reopen the case on the following morning on the ground that to admit the evidence in splendid isolation would give it undue emphasis.").

\* \* \*

This clearly was a challenging case, for both the prosecution and the defense, but appellant has not established that the government suppressed exculpatory evidence, in violation of the *Brady* doctrine. The judgment of the Superior Court should be affirmed.

RUIZ, Associate Judge, concurring:

I fully join Judge Schwelb's opinion for the court reversing appellant's convictions and remanding for a new trial. Because we conclude that the government's suppression of exculpatory information violated appellant's due process rights, on remand, the trial court should, as appropriate, conduct an inquiry to determine whether government counsel complied with Rule 3.8(e) of the District of Columbia Rules of Professional Conduct,[1] and with Rule 3.3 ("Candor to the tribunal") in connection with representations to the court and defense counsel that *Brady* material had been disclosed and that there was no evidence that would have permitted a *Winfield* defense.[2] *See* Code of Judicial Conduct for the District of Columbia Courts, Canon 3(D)(2) & cmt. (1995) (prescribing judge's obligation to "take appropriate action" where "lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to the lawyer's honesty, trustworthiness or fitness as a law-

---

ment prevented the defense from finding and using that portion of the videotape.

17. The trial judge had reopened evidence on two occasions, permitting the government to recall Mr. Lindsey after he had been excused and to introduce two documents after it had rested. On the first occasion, the judge explained that it was his practice to permit additional questions "if another witness hasn't been called, or if the next phase hasn't begun," and that this was a courtesy he would extend to both sides. Neither of these previous requests occurred after a new phase of the trial had already begun.

When defense counsel sought to reopen its case, asking the court to "extend the same courtesy," the judge immediately noted, "After I've begun jury instructions? That's different." Before ruling, the court emphasized that the defense was asking to reopen "after the witness [Lindsey] has been excused and after the government has rested and the defense has rested and after arguments on motions for judgment of acquittal have taken place...." Because a new phase of the trial had begun, there was no inconsistency in the judge's treatment of the defense request to reopen.

1. Rule 3.8(e) makes *intentional* failure to comply with the government's *Brady* disclosure obligation an ethical violation. See Majority Opinion, *ante* at 1108 n. 16. A prosecutor's honest mistake or oversight does not implicate ethical concerns.

2. *Winfield v. United States,* 676 A.2d 1 (D.C. 1996). See Majority Opinion, *ante* at 1114 n. 23.

yer," including "direct communication with the ... lawyer" and "reporting the violation"); *see also* Model Code of Judicial Conduct, Rule 2.15(B) & (D) & cmt. [2] (2007) (same). A similar inquiry would also be relevant if there is a new trial and the defense again requests that the jury be instructed about the government's failure to disclose exculpatory information as required by *Brady.* See Majority Opinion, *ante* at 1104 n. 9; Dissenting Opinion, *post* at 1105–06 n. 12.

To be clear, I am not suggesting, on the record we have, that the prosecutor acted in bad faith or knowingly withheld information he knew to be exculpatory. See Majority Opinion, *ante* at 1108 n. 15. There are too many unanswered questions to come to that conclusion: when did the trial prosecutor (who also questioned Taylor when he testified before the grand jury that the shooter used his left hand and had short hair) know that appellant is right-handed (as the trial prosecutor proposed to stipulate at trial) and had dreadlocks; whether the prosecutor knew that Lindsey, who was another suspect, is apparently left-handed, *see* District of Columbia Prof. Conduct R. 3.8(d); and when did the prosecutor become aware that Taylor changed his mind about which hand the shooter used and the reason for that change. The transcript reveals that in connection with the defense's requested *Brady* instruction, the trial judge began to inquire into when certain exculpatory information was disclosed to the defense, but turned to the question of prejudice before completing the factual inquiry. This colloquy took place before the late disclosure of Taylor's grand jury testimony came to the judge's attention, however, and the judge, who understandably was dealing with the matter at hand, did not have the professional rules in mind. The manner and scope of any further inquiry is within the trial court's discretion.

SCHWELB, Senior Judge, with whom FISHER, Associate Judge, joins, concurring:

As noted by Judge Ruiz, *post,* p. 74, she and I are in full agreement with respect to the proper disposition of this appeal and the legal issues presented to us by the parties. Both Judge Fisher and I, however, disagree with her concurring statement, in which she states her views as to what should occur in the trial court following remand. Those views are, of course, her own, and they do not represent the position of the court.

Judge Ruiz proposes that, on remand, the judge should consider conducting an inquiry to determine whether the prosecutor has violated certain Rules of Professional Conduct. Until now, no party has raised such a question, and Miller's very able and resourceful attorneys have carefully avoided any suggestion that the prosecutor committed an ethical violation. The legal issue as to the point at which exculpatory information must be disclosed to the defense, in circumstances such as those before us, is a difficult one, as to which reasonable judges and lawyers can and do disagree, conscientiously and in good faith. We do not believe that the vigorous assertion of counsel's position as to when disclosure was mandated should be viewed as potentially implicating counsel's professional ethics. In any event, we think that it would be unfair for the prosecutor's first inkling of this proposal (*i.e.,* that his compliance with ethical standards may merit investigation, as Judge Ruiz suggests) to come in the form of a published appellate opinion.